Michael CULLEN and Margaret
Cullen, Plaintiffs,

v.

E.H. FRIEDRICH CO., INC. and
Robert Potorski, Defendants.

Civ. A. No. 94–30016 MAP.

United States District Court,
D. Massachusetts.

Nov. 15, 1995.

Sean P. O'Leary, Robert G. O'Leary, Springfield, MA, Michael O. Shea, Raipher D. Pellegrino, Pellegrino & O'Connell, P.C., Springfield, MA, for Michael Cullen.

Sean P. O'Leary, Robert G. O'Leary, Springfield, MA, for Margaret Cullen.

Gordon D. Quinn, Sullivan & Hayes, Springfield, MA, Anthony Hazen, Law Office of Robert F. O'Day, North Quincy, MA, for

E.H. Friedrich Company, Inc., Robert Potorski.

### ORDER

PONSOR, District Judge.

This case is before the Court on the Magistrate Judge's Report and Recommendation regarding the defendants' Motion for Summary Judgment.

No objection to the Recommendation has been filed. Moreover, this court has reviewed the Report and Recommendation *de novo* and found it well supported. For these reasons, it is hereby ordered that the Recommendation be adopted and that the defendants' Motion for Summary Judgment be allowed.

It is so ordered.

*REPORT AND RECOMMENDATION OF COURT ON DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT*

(Docket No. 27)

NEIMAN, United States Magistrate Judge.

### I. INTRODUCTION

This action arises out of Plaintiff Michael Cullen's termination from the employ of Defendant E.H. Friedrich Co., Inc. by its president, Defendant Robert Potorski. Plaintiff Margaret Cullen, Michael's wife, asserts a claim for loss of consortium. Pursuant to Federal Rule of Civil Procedure 56, Defendants have moved for summary judgment on all of Plaintiffs' claims (Counts One through Eight). Defendants' motion has been referred to the Court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts. 26 U.S.C. § 636(b)(1)(B). On October 6, 1995, Plaintiffs voluntarily dismissed Mr. Cullen's claims of negligent hire, supervision and retention of an employee (Count One), negligent infliction of emotional distress (Count Two), negligent failure to provide a safe workplace (Count Three), and breach of the collective bargaining agreement's just cause provision (Count Seven). See Stipulation of Dismissal Under F.R.C.P. 41(a)(1) of Counts I, II, III, and VII of the Plaintiffs' Complaint (Docket No. 46). For the reasons set forth below, the Court recommends allowing the motion for summary judgment with regard to all of Plaintiffs' remaining claims: wrongful discharge in violation of public policy (Count Four), defamation (Count Five), promissory estoppel (Count Six) and loss of consortium (Count Eight).

### II. FACTUAL BACKGROUND

Defendant E.H. Friedrich Co., Inc. ("Friedrich") manufactures metal doors and frames and has its principal place of business in Holyoke, Massachusetts. Friedrich hired Plaintiff Michael Cullen ("Cullen") as a welder on September 8, 1986 and fired him October 15, 1992 for an alleged altercation with another welder, Edward Smith ("Smith"), on September 24, 1992. Smith, who was also fired for his involvement in the fight, is not a party to this action. Friedrich considers fighting a dischargeable offense and its President, Defendant Robert Potorski ("Potorski"), had suspended and fired two employees for fighting on company premises prior to Cullen's termination.

Cullen, throughout his employment at Friedrich, was covered by a collective bargaining agreement ("CBA") between the company and Carpenters Local Union No. 108. The CBA provides that an employee who receives at least two written warnings within a six month period is subject to discharge. It allows Friedrich to discipline or discharge an employee for just cause "without the necessity of first giving a warning," and gives the company the exclusive right to select, transfer, discipline, discharge, hire and assign employees, "to maintain discipline and order," and to "enforce rules for employee conduct." The CBA also provides that an employee challenging any disciplinary decision must file a grievance with the union shop steward within five working days and that a challenged discharge decision shall be immediately referred to a "Grievance Committee" where union representatives, the em-

ployee and management may discuss the matter. Finally, the CBA makes the union "the sole and exclusive judge of whether or not [the grievance] proceeds to arbitration" after the conclusion of the Grievance Committee meeting. See Defendants' Joint Motion for Summary Judgment ("Defendants' Motion"), Exhibit 3.

Sometime during the morning of Thursday, September 24, 1992, Cullen claims that Smith antagonized him by denigrating his wife, Plaintiff Margaret Cullen, and by making obscene physical gestures. There are several versions as to how Cullen responded to Smith's alleged provocation. On the one hand, are employees Bill Chagnon, who says he saw Cullen pushing Smith and throwing a 36″ metal gauge or pipe at Smith on company premises, Hal Glanville, who allegedly observed Cullen strike Smith, and Peter Gallo, who claims to have seen Cullen throw a punch and that Smith then emerged from the break area holding his mouth and complaining that he "was hit by Mike Cullen." See Defendant's Motion, Exhibits 7–9. On the other hand, are Cullen, who denies punching or throwing anything at Smith, and employee Dan Majerowski, who stated: "Mike Cullen threw a metal gauge in the air but not in Eddie's [Smith's] direction as it was obvious he really did not intend to throw it at Eddie. He threw it because he was mad and wanted to show him he was angry and wanted Ed Smith to leave him alone." See Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment ("Plaintiffs' Opposition"), at 2. In any event, there is no dispute that around 12:25 p.m., Smith struck Cullen several times on his skull with a metal pipe on a sidewalk immediately outside Friedrich's building, that Cullen was injured and that Smith was fired later that day.

On Saturday, September 26, 1992, Potorski, who had been away from the company since 11:00 a.m. on the day of the alleged altercation, first learned of the incidents and decided to interrupt his vacation in order to conduct an investigation. On the morning of September 28, 1992, Potorski asked Cullen to submit a written statement concerning the alleged incidents. Cullen refused, claiming that his attorney told him not to provide any written statements. Sometime during that same morning, Friedrich supervisors, Larry Welch and David Brookbank, issued Cullen a written warning for his "Gross Misconduct" the previous Thursday. See Plaintiff's Opposition, Exhibit E. Subsequently, during the early part of that week, Potorski also spoke with Chagnon, who told him that he saw Cullen push and throw a metal gauge at Smith, and Glanville and Gallo, who told him that they either saw or heard Cullen punch Smith.

Cullen swore out a criminal complaint against Smith immediately after the alleged altercation and on Friday, September 25, 1992, Smith was arraigned in Holyoke District Court on charges of assault and battery with a dangerous weapon.[1] According to Cullen, Potorski approached him on Thursday, October 1, 1992, and asked what he was going to tell the District Attorney with regard to the assault and battery prosecution. Cullen says that he told Potorski that he would pursue the charge and would tell the District Attorney that Smith used and distributed illegal drugs on Friedrich's premises. Cullen had allegedly witnessed Smith distribute and/or share marijuana and cocaine on company premises and complained to Potorski about this. Potorski admits to having known about Smith's drug usage, but denies that Cullen told him that he was going to the D.A. with the drug information. Production manager Larry Welch, when asked whether he had been told that Smith was using drugs, replied, "I'd heard it. I've heard it about a lot of people in there. It's only hearsay." Plaintiff's Opposition, Exhibit F.

On October 5, 1992, Potorski, in the presence of the union steward, suspended Cullen and told Cullen to call him on October 15, 1992 concerning his status as there was the possibility of termination. Cullen claims that Potorski told him that his suspension did not mean that he was being fired. On October

---

**1.** On February 1, 1993, Smith pleaded guilty to the charges. Although Smith attempted to have Cullen charged with assault and battery, a clerk-magistrate refused to issue a complaint against Cullen.

15, 1992, Potorski spoke with and wrote to Cullen, explaining that he was being terminated for punching Smith. Copies of the otherwise confidential letter were sent to Mark Spirito, the union steward, and David Bergeron, another union official, but no one else. Cullen subsequently hand-delivered a note to Potorski's secretary and, on October 19, 1992, Potorski forwarded Cullen's note, which he treated as a grievance, to Spirito, the union steward.

On December 3, 1992, a meeting was held to discuss Cullen's grievance. Present at the meeting were Cullen, Potorski, Spirito and Bergeron. At the meeting, Potorski stated that Cullen had been fired for fighting and that he had statements from three employees who had seen Cullen hit Smith. Cullen does not dispute that, at the meeting, Potorski stated that he had statements from three men who had "seen me hit Mr. Smith." See Defendant's Statement of Material Facts, Exhibit 11b (Cullen deposition), at 95. (Prior to the meeting, Cullen knew that Chagnon, Glanville and Gallo, who had also spoken with union officials, alleged that he had initiated a fight with Smith. See id., at 85, 97.) The union asked Friedreich to provide it with "written" statements from these employees within several weeks. After the meeting, Potorski sent Cullen a letter, dated December 16, 1992, stating that the discharge was justified. Copies of this letter were also sent to Spirito and Bergeron.

Friedrich subsequently provided the union with written statements from Chagnon, Glanville and Gallo, although Cullen claims, without explanation, that they were coerced into giving their statements. After receiving the statements, the union decided not to pursue Cullen's grievance to arbitration, informing Cullen of its decision verbally and by letter. Cullen believes that the union did a good and thorough job investigating his grievance.

### III. SUMMARY JUDGMENT STANDARD

The role of summary judgment in civil litigation is to pierce the boilerplate of the pleadings and assay the parties' proof in an effort to determine whether trial is actually required. *McCarthy v. Northwest Airlines*, 56 F.3d 313, 314 (1st Cir.1995) (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)). Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). See *Flanders & Medeiros, Inc. v. Bogosian*, 65 F.3d 198, 201 (1st Cir. 1995); and *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994).

The Court must view the evidence as a whole, rather than in isolation. *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). The facts must be viewed in the light most favorable to the non-moving party. *Santiago–Ramirez v. Secretary of Dep't of Defense of the United States*, 62 F.3d 445, 446 (1st Cir.1995). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes*, 18 F.3d at 15 (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). It is inappropriate for a court to determine issues of credibility, since a court may not resolve any credibility assessment in favor of the party seeking summary judgment. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1089 n. 1. (1st Cir.1995) (citing *Velez–Gomez v. SMA Life Assur. Co.*, 8 F.3d 873, 877 (1st Cir.1993)).

Once a summary judgment motion has been filed, the party to whom the motion is directed can defeat it only by showing that a trial-worthy issue exists. *McCarthy*, 56 F.3d at 315 (citing *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995)). The target of the summary judgment motion must affirmatively point to specific facts that demonstrate the existence of an authentic dispute, at least with respect to the issues on which the target bears the ultimate burden of proof. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). The factual dis-

pute must be "material" and the dispute over it must be "genuine." A "genuine" issue is one that only a finder of fact can properly resolve because it may reasonably be resolved in favor of either party and a "material" issue is one that affects the outcome of the suit. *Collins v. Martella,* 17 F.3d 1, 3 n. 3 (1st Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 2510, 2511, 91 L.Ed.2d 202 (1986)). Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Horta v. Sullivan,* 4 F.3d 2, 11 (1st Cir.1993). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Navigation Co.,* 974 F.2d 221, 223 (1st Cir.1992).

## IV. DISCUSSION

Viewing the evidence in a light most favorable to Plaintiffs, the Court finds that there are no genuine issues of material facts and, as a matter of law, recommends that Defendants' motion for summary judgment be granted on all of the remaining claims, i.e., discharge in violation of public policy (Count Four), defamation (Count Five), promissory estoppel (Count Six) and loss of consortium (Count Eight).

Defendants first argue that Counts Four, Five and Six, which are brought only by Mr. Cullen, are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("§ 301").[2] According to the First Circuit, "[i]t is well-established that § 301 completely preempts a state law claim if the resolution of the claim necessitates analysis of, or substantially depends on the meaning of, a collective bargaining agreement." *Quesnel v. Prudential Ins. Co.,* 66 F.3d 8, 10 (1st Cir.1995) (citations omitted). Where preemption applies, federal labor-law principles must be employed to resolve the matter. *Magerer v. John Sexton & Co.,* 912 F.2d 525, 528 (1st Cir.1990).

As there is no dispute that Cullen is subject to the CBA, the Court must dismiss his claims as preempted if their resolution necessitates analysis of, or substantially depends upon the meaning of, the CBA. Compare *Quesnel,* 66 F.3d, at 10. The analysis must focus on whether the actions alleged can stand on their own, or, instead, whether their evaluation "is inextricably intertwined with consideration of the terms of the labor contract." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985). Given the foregoing principles, the Court considers Cullen's various claims.

### 1. Wrongful Discharge in Violation of Public Policy

In Count Four, Cullen claims that he was fired, not for fighting, but for informing Potorski that he was going to tell the District Attorney about Smith's drug use on company property. Cullen thus concludes that his discharge was in violation of public policy. In response, Defendants argue that Count Four should be dismissed because it is preempted by § 301 and because Cullen has failed to state a claim for wrongful discharge in violation of public policy pursuant to Massachusetts law.

Defendants reach their first conclusion—that Count Four is preempted by § 301—by analyzing the underlying state-based cause of action, i.e., wrongful discharge in violation of public policy. Although the connection between Defendants' conclusion and their analysis is not immediately apparent, it is clear that in order to determine whether a particular state-based cause of action is preempted by § 301, a court must analyze the specific elements of the state-based claim. See, e.g., *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 406–407, 108 S.Ct. 1877, 1881–1882, 100 L.Ed.2d 410 (1988) (analyzing state tort of retaliatory discharge); and *Magerer v. John Sexton & Co.,* 912 F.2d 525, 529–531 (1st Cir.1990)

---

**2.** Section 301(a) of the LMRA states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act or between any such labor organizations may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

(analyzing Massachusetts torts of statutory retaliatory discharge and intentional interference with contract); see also *Allis–Chalmers*, 471 U.S. at 214, 105 S.Ct. at 1912 ("[T]he question whether the [state claim] is sufficiently independent of federal contract interpretation to avoid pre-emption is, of course, a question of federal law").

 The Massachusetts cause of action for wrongful discharge in violation of public policy is a judicially created exception to the "employment at will" doctrine. This doctrine holds that an employee, who works without the benefit of an employment contract, may be discharged for almost any reason with or without cause. See *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411, 412 (1988). The cause of action, however, is only available to "at-will" employees. See *Norris v. Lumbermen's Mut. Cas. Co.*, 881 F.2d 1144, 1152–53 (1st Cir.1989) ("[u]nder Massachusetts law, 'liability can be imposed on an employer who terminates an *at-will* employee in violation of a clearly established public policy'" (quoting *Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 416, 522 N.E.2d 975, 979 (1988)) (emphasis added)); and *St. Arnaud v. Chapdelaine Truck Ctr.*, 836 F.Supp. 41, 43 (D.Mass.1993) (under Massachusetts law, employers may be held liable to terminated *at-will* employees, if method of termination violated clearly established public policy). Allowing employees governed by a CBA to assert an independent, common law claim of wrongful discharge would not be "a commendable practice. 'It would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.'" *Azzi v. Western Electric Co.*, 19 Mass.App.Ct. 406, 410, 474 N.E.2d 1166, 1169 (1985) (quoting *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653, 85 S.Ct. 614, 617, 13 L.Ed.2d 580 (1965)).[3]

Cullen was not an at-will employee. Rather, his employment was intimately bound by a CBA which provided that he could be discharged only for "just cause." In addition, the CBA established a grievance procedure by which Cullen could voice objections to Defendants' actions and request review in arbitration if he was not satisfied with the initial levels of review. The public policy exception to the employment at will doctrine simply does not apply to him. Accordingly, Cullen—who does not contest that he is not an at-will employee—is unable to assert a viable common law cause of action of wrongful discharge in violation of public policy.

 Even if Cullen had been an at-will employee at the time of his discharge, it is questionable whether Cullen has stated an actionable public policy claim under Massachusetts law. In order for Count Four to succeed, Cullen would have to show that he was discharged "for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith–Pfeffer v. Superintendent of Walter E. Fernald State School*, 404 Mass. 145, 149, 533 N.E.2d 1368, 1371 (1989). The public policy exception does not extend to protect employees who perform "appropriate, socially desirable duties" from being subject to discharge without cause. *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 474, 589 N.E.2d 1241, 1245 (1992).

Cullen, however, has cited nothing that clearly expresses a public policy to encourage reporting of drugs usage or drug distribution in the workplace other than the Federal Drug–Free Workplace Act, 41 U.S.C. § 701 *et seq.*, which, as he recognizes, applies only to federal contractors and is intended to encourage employers to educate employees about the dangers of drugs. Nor is there any evidence that Cullen, in assisting the District Attorney with the assault and battery prosecution against Smith, was ever cooperating with an "ongoing governmental in-

---

**3.** See also *Tenedios v. Wm. Filene's Sons Co.*, 20 Mass.App.Ct. 252, 254–255, 479 N.E.2d 723, 725–726 (1985) (noting that the doctrine of *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977)—concerning the discharge of employees at-will—applies only to *at-will* employees and does not apply where em- ployee is covered by a CBA); and *Bertrand v. Quincy Market Cold Storage & Warehouse Co.*, 728 F.2d 568, 571 (1st Cir.1984) (covenant of good faith and fair dealing has been applied only in *at-will* contracts, not where the company negotiated away its right to discharge anyone except for just cause).

vestigation" of misconduct at Friedrich. Compare *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810–811, 575 N.E.2d 1107, 1111 (1991) ("[R]edress in certain circumstances [is available] for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed"). While Cullen claims to have been performing the important public deed of "whistleblowing," the Court notes that he admitted during his deposition that he never actually informed any law enforcement agency about alleged drug usage and distribution at the company. See Plaintiff's Opposition, at Exhibit C–III. In the Court's view, Cullen's assertions that he told Potorski of his intent to inform the District Attorney of Smith's drug use on company premises, even if true, provides meager support for a claim for wrongful discharge in violation of Massachusetts public policy.

While the First Circuit has yet to specifically rule whether a Massachusetts action of wrongful discharge in violation of public policy is preempted by § 301, the court recently employed § 301 to affirm the dismissal of a similar termination claim. In *Quesnel*, the plaintiff claimed that his termination was motivated by his employer's desire to deny him earned commissions, an action which is considered a "wrongful termination" under Massachusetts law. The applicable CBA governed the terms of compensation and set forth grievance procedures for wrongful termination. District Court Judge Michael A. Ponsor held that the plaintiff's claims were preempted by § 301 and dismissed the action. *Id.*, 66 F.3d at 9.

On appeal, the First Circuit, after finding that the CBA applied to the plaintiff, turned to the preemption issue:

Having carefully examined the CBA, we think that the district court correctly found that the CBA is directly implicated in any resolution of Quesnel's claims. The CBA sets forth the terms and scope of the employment relationship of all district agents, encompassing rates of pay, wages, and conditions of employment. Significantly, the CBA sets forth grievance procedures for alleged wrongful termination. Determination of whether Quesnel was indeed wrongfully terminated, and whether his failure to follow grievance procedures set forth in the CBA nonetheless precludes his claim would require a court, as the district court found, to immerse itself in the CBA's terms. Interpretation of the CBA is therefore crucial to any resolution of Quesnel's claims.

*Id.*, at 10. Accordingly, the court affirmed the District Court's decision to dismiss. *Id.*, at 11. See also *Paradis v. United Technologies, Pratt & Whitney Div.*, 672 F.Supp. 67, 69–70 (D.Conn.1987) (the Connecticut protection of prohibiting discharges which are in violation of public policy is not available to employees whose discharge is contractually protected by a just cause provision of a CBA).

The First Circuit's reasoning in *Quesnel* applies here. Thus, even were Cullen's discharge due to his threat to inform the District Attorney about drug activity on company premises rather than his fighting, the resolution of Defendants' decision depends upon an interpretation of the just cause provision of the CBA. As in *Paradis*, "[t]hat is a question which was intended by [D]efendant[s] and [Cullen], through his collective bargaining agent, to be decided under the contract." *Paradis*, 672 F.Supp. 67, 70 (citing *Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983)). And, as in *Quesnel*, the CBA here has a detailed grievance procedure for alleged wrongful termination, *id.*, 66 F.3d at 10.

Finally, Cullen's reliance on Supreme Court cases failing to find preemption in light of a viable state-law claim is misplaced. In *Hawaiian Airlines v. Norris*, —— U.S. ——, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), the plaintiff's claims had already been deemed viable by the supreme court of Hawaii. See *Norris v. Hawaiian Airlines*, 74 Haw. 235, 258–65, 842 P.2d 634, 645–47 (1992). Similarly, in *Lingle*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410—a case which, unlike here, involved a retaliation claim that could be statutorily pursued by employees at will and employees governed by a CBA alike—and in

*Livadas v. Bradshaw*, ——— U.S. ———, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the question of whether the plaintiff had made the threshold showing of the viability of her state-based cause of action never arose.[4]

In sum, Cullen cannot avail himself of the public policy doctrine because he is not an at-will employee. Moreover, even if Cullen has a viable claim for wrongful termination in violation of public policy, it is thin at best. Finally, any such claim here is preempted by § 301. Thus, the Court need not reach the factual issue as to whether Cullen was performing an important public deed, such as whistleblowing, in order to recommend granting summary judgment on Count Four.

### 2. Defamation

■ In Count Five, Cullen claims he was defamed by two letters prepared and distributed by Potorski in the context of the grievance proceedings. In an October 15, 1992 letter, Potorski informed Cullen that his suspension from employment would remain permanent because Cullen "did punch another employee on Company property during working hours." See Defendants' Local Rule 56.1 Statement of Material Facts ("Defendant Statement of Material Facts"), Exhibit 4. In a December 16, 1992 letter, Potorski informed Cullen that "the Company feels there is enough evidence to support our original decision to permanently terminate your employment with the Company for punching another employee on Company property." Id., at Exhibit 10. These letters were distributed only to Cullen, Potorski, Spirito (the union steward) and Bergeron (another union official). There is no dispute as to the foregoing facts. See Plaintiffs' Opposition, at 2; Defendants' Brief in Reply to the Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Docket No. 45), at 8. Defendants claim that Count Five is preempted by Section 301 of the LMRA.

In *Mouradian v. John Hancock Cos.*, 751 F.Supp. 262 (D.Mass.1988), the plaintiff had been employed pursuant to a CBA which provided that an employee could not be discharged "except for just and sufficient cause." The plaintiff-employee brought a malicious libel action against the district manager based on a statement in his termination letter that his sales performance was "totally unsatisfactory." The Court held that the plaintiff's libel claim was preempted by § 301 because it was based on, and inextricable from, the rights and obligations flowing from the CBA. *Id.*, at 267 (citing *Allis–Chalmers Corp.*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206), *vacated on other grounds*, No. 88–2072, 1989 WL 225052 (1st Cir. May 26, 1989). As determined in *Hull v. Central Transport, Inc.*, 628 F.Supp. 784 (N.D.Ind. 1986),

> [t]o hold otherwise would allow the threat of defamation suits for [statements] during grievance [proceedings] to introduce an element of uncertainty into the grievance process as well as chilling the advocacy of the positions of the parties. As a result, parties would be much less willing to agree to grievance mechanisms that are fraught with potential liability under state tort law. Such a result would fly directly in the face

---

**4.** Cullen's reliance on decisions applying § 301 preemption principles in the context of other state jurisdictions is similarly misplaced. Despite the fact that most of the cases relied upon by Cullen assume the viability of the underlying claim and that many find preemption in the context of the Railway Labor Act ("RLA"), each involves a different cause of action from the case at bar. See *Hirras v. National Railroad Passenger Corp.*, 44 F.3d 278, 282 (5th Cir.1995) (Texas intentional infliction of emotional distress claim); *Taggart v. Trans World Airlines*, 40 F.3d 269, 270, 274 (8th Cir.1994) (Missouri handicap discrimination claim); *Martin Marietta Corp. v. Maryland Commission on Human Relations*, 38 F.3d 1392, 1402 (4th Cir.1994) (Maryland statutory retaliatory discharge claim); *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 231–232 (3rd Cir.1995)

(Pennsylvania breach of contract, fraud and intentional infliction of emotional distress claims); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1121 (10th Cir.1995) (Oklahoma wrongful disability discrimination claims); *Umphrey v. Fina Oil & Chemical Co.*, 882 F.Supp. 585, 588 (E.D.Tex.1995) (Texas statutory retaliatory discharge claim); *Mack v. Metro–North Commuter Railroad*, 876 F.Supp. 490, 494 (S.D.N.Y.1994) (state law defamation, non-employment related, claim); *Cooper v. Norfolk & W.Ry.*, 870 F.Supp. 1410, 1423 (S.D.W.V. 1994) (West Virginia race discrimination claim); and *Duncan v. Icenogle*, 873 F.Supp. 579, 584 (M.D.Ala.1994) (Alabama fraud claim). The Massachusetts courts have uniformly held that the Massachusetts action of wrongful discharge in violation of public policy is only available to "at-will" employees.

of the federal labor policy, which encourages settlement of labor disputes through nonjudicial means.

*Id.,* at 789. Nearly every other court reviewing this issue has come to a similar conclusion.[5]

As in *Mouradian* and the vast majority of cases finding preemption, Cullen's defamation claims are based on facts inextricably intertwined with the grievance and arbitration machinery of the CBA. Cullen's claims directly relate to the circumstances surrounding his discharge. The reason which Potorski articulated in the letters for his discharge was Cullen's fighting with another employee on company premises during working hours. Because any judicial resolution of his defamation claims would necessarily involve a construction of the CBA to determine whether Cullen was wrongfully discharged, § 301 preempts this cause of action and the Court recommends granting summary judgment on Count Five.[6]

### 3. Promissory Estoppel

In Count Six, Cullen claims that he reasonably relied to his detriment on the written warning issued to him on September 28, 1992 by Friedrich supervisors Larry Welch and David Brookbank. The warning read as follows:

> You are hereby notified that a Warning is given to you for the following reason: Gross Misconduct on Thursday, September 24, 1992. Any future acts of misconduct will result in immediate dismissal. This is

---

**5.** See, e.g., *Shane v. Greyhound Lines, Inc.,* 868 F.2d 1057, 1063 (9th Cir.1989) (employee's defamation claim preempted by § 301 where alleged statements were contained in discharge notices required under the CBA); *Willis v. Reynolds Metals Co.,* 840 F.2d 254, 254–255 (4th Cir.1988) (employee's claim that employer slandered her dealt with employer's right pursuant to CBA to conduct investigations into possible harassment and its associated right to confront suspected employee); *Johnson v. Anheuser Busch, Inc.,* 876 F.2d 620, 624 (8th Cir.1989) (employee's libel claim against employer and coworkers was preempted by § 301 insofar as allegations about his involvement in tire slashing incident were reduced to writing during the course of CBA-governed discharge proceedings); *Bagby v. General Motors Corp.,* 976 F.2d 919, 921 (5th Cir. 1992) (employee's claim of defamation was preempted by § 301 where employee failed to use grievance procedure prescribed in CBA); *Durrette v. UGI Corp.,* 674 F.Supp. 1139, 1143 (M.D.Pa.1987) (claims for defamation regarding unexcused absences were intertwined with circumstances surrounding employee's termination and thus preempted by § 301); *Barbe v. Great Atlantic & Pacific Tea Co.,* 722 F.Supp. 1257, 1262 (D.Md.1989) (employee's defamation claims against employer based on letter from employer to union accusing employee of falsifying company documents required interpretation of CBA and were thus preempted by § 301); *Chube v. Exxon Chemical Americas,* 760 F.Supp. 557, 561 (M.D.La.1991) (employee's defamation claims arose out of alleged wrongful termination and required interpretation of terms of CBA and were thus preempted by § 301); and *Green v. Hughes Aircraft Co.,* 630 F.Supp. 423, 426–427 (S.D.Cal. 1985) (defamation action based on written accusations of theft preempted since discipline of employees was governed by CBA).

**6.** Cullen's claims are readily distinguishable from the cases he cites from other jurisdictions in which defamation claims have been held to not be preempted by § 301. Unlike here, the claims in those cases clearly did not arise out of conduct relating to the grievance and arbitration procedures in a CBA. See *Jackson v. Southern California Gas Co.,* 881 F.2d 638, 645 (9th Cir.1989) (no preemption under § 301 where "the accusations [by other employees that plaintiff bought cocaine] do not appear to have been made pursuant to any requirements of the disciplinary procedures [of the CBA]"); *Monsour v. Delco Remy, Plant 25,* 851 F.Supp. 245, 249 (S.D.Miss.1994) (failing to find preemption under § 301 where plaintiff is not threatened with disciplinary action, his complaint does not allege a violation of the CBA and the nature of his claim does not implicate any rights under the CBA); *Meier v. Hamilton Standard Electronic Systems, Inc.,* 748 F.Supp. 296, 299 (E.D.Pa.1990) (to the extent plaintiff alleged that defamatory statements were made outside the limited context of the investigation into drug trafficking at the facility or to individuals who had no connection to the grievance procedures, his defamation claims are not governed by the CBA and thus not preempted); *Adams v. Shulton, Inc., U.S.A. Div.,* 747 F.Supp. 1258, 1260 (W.D.Tenn.1990) (no preemption under § 301 where plaintiff's defamation claims can be resolved without interpreting the CBA); *Vorvis v. Southern New England Tel Co.,* 821 F.Supp. 851, 854–856 (D.Conn.1993) (§ 301 does not preempt plaintiff's claim that supervisor made false and malicious statements in front of coworkers about her role in a malfunction of services); *Messina v. Tri–Gas Inc.,* 816 F.Supp. 1163, 1169 (S.D.Tex.1993) (§ 301 does not preempt plaintiff's defamation claim where dissemination of the statements to members of the trucking industry at large would not have been made pursuant to any requirement of the disciplinary procedures prescribed by the CBA).

your first Warning issued to you within the past six months.

See Plaintiffs' Complaint, Exhibit A. Cullen asserts that, because of this warning, Friedrich was "estopped" from subsequently terminating his employment for the alleged altercation.

The Court finds that Cullen's promissory estoppel claim, as with his other claims, substantially depends upon, and is inextricably intertwined with, the grievance, arbitration and just cause provisions of the CBA, see *Allis–Chalmers Corp.*, 471 U.S. at 220, 105 S.Ct. at 1916, and is thus preempted by § 301. Courts have uniformly come to similar conclusions in just such a situation.[7] Indeed, Cullen's promissory estoppel argument is precisely the type of claim which the union might have been expected to raise before an arbitrator had it decided to proceed to arbitration on Cullen's grievance in accordance with the procedures of the CBA. Not only did the union decide not to proceed to arbitration on behalf of Cullen, but Cullen has no quarrel with the union—he believes it did a good and thorough job investigating his grievance. In fact, he has voluntarily dismissed his claim alleging breach of the CBA's just cause provision (Count Seven), conceding that he does not have enough evidence to establish that a grievance would have been futile or that Defendants repudiated the grievance procedures. See Plaintiff's Opposition, at 1.

Furthermore, Cullen fails to support several of the essential elements of a promissory estoppel claim. First, Cullen has not alleged, nor can he demonstrate, that there was any "promise" made by the Defendants. While the warning stated that "[a]ny future acts of misconduct will result in immediate dismissal," there is no evidence that anyone "promised" him that he would not be discharged for allegedly punching Smith. Second, Cullen fails to adequately allege "reasonable reliance." Although Cullen claims that, after receiving the warning, he "did not approach other employees to gain evidence that would exonerate him at a grievance hearing," and that "he did not file a grievance based on the mere warning," Plaintiffs' Opposition, at 12, he fails to mention that on the same day he received the warning, Potorski approached him early in the morning and told him that he was investigating the incidents and asked him to provide a written statement concerning his version of what had transpired. Defendants' Statement of Facts, at 8. Compare *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33–34 (1st Cir.1988) (granting summary judgment on promissory estoppel claim where "[t]he conflicting content of [the defendant]'s oral statement with [his] written statement ... should have placed [the plaintiff] on notice that he should not rely on either statement"). In sum, Cullen has not sufficiently demonstrated, as a matter of law, that he reasonably relied to his detriment on a promise made by Defendants. For all these reasons, the Court recommends that summary judgment be granted on Count Six.

### 4. Loss of Consortium

■ In Count Eight, Mrs. Cullen alleges loss of consortium due to Friedrich's "negli-

7. See *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 801 (6th Cir.1990) (plaintiff's promissory estoppel claim against union and employer predicated solely upon their alleged promise "that they would control the situation regarding her job harassment" is intertwined with interpretation of CBA and thus preempted by § 301); *Ziobro v. Connecticut Inst. for Blind*, 818 F.Supp. 497, 501–502 (D.Conn.1993) (§ 301 preempts employee's promissory estoppel claim which, although not based on the CBA but on "statements, conditions, and/or representations" allegedly made to plaintiff, is substantially dependent upon analysis of the CBA). See also *International Union, United Auto., Aerospace, & Agric. Implement Workers v. Loral Corp.*, 873 F.Supp. 57, 65 n. 16 (N.D.Ohio 1994) (pendant state law claims of promissory estoppel must be dismissed as preempted by § 301); *Hood v. Sweetheart Cup Co.*, 816 F.Supp. 720, 724–725 (S.D.Ga.1993) (plaintiffs' claims of promissory estoppel and wrongful discharge clearly necessitate interpretation of the CBA and, as such, are preempted by § 301); *Leonardis v. Burns Int'l Sec. Services, Inc.*, 808 F.Supp. 1165, 1182 (D.N.J.1992) (employees' promissory estoppel claim against employer for reimbursement of attorney fees incurred in criminal action arising out of their employment as security guards is preempted by § 301); *Smith v. Capitol Mfg. Co., Div. of Harsco Corp.*, 626 F.Supp. 110, 112–114 (S.D.Ohio 1985) (plaintiff's claim of wrongful discharge, i.e., that he is entitled to relief under the promissory estoppel exception to the employment "at-will" doctrine, is preempted by § 301).

gent" actions toward her husband. However-er, the only claims listed as "negligence" claims (Counts One, Two and Three) have been voluntarily dismissed. Plaintiff attempts to overcome this flaw by arguing that the loss of consortium claim can be tied to Mr. Cullen's wrongful discharge claim (Count Four) and by indicating her willingness to amend the complaint if necessary. See Fed. R.Civ.P. 15.

■ The Court does not need to decide, however, whether Count Eight is derivative of any of the non-dismissed counts or whether this is a situation where justice requires granting leave for Plaintiffs to file an amended complaint. Rather, because the Court recommends that her husband's remaining claims are preempted by § 301, Mrs. Cullen's derivative loss of consortium claim must also be dismissed. Exempting loss of consortium claims from preemption would inject into the labor relations area precisely the inconsistency that the preemption doctrine originally sought to eliminate. If the underlying claim is preempted, the loss of consortium claim must also be barred. See *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 623–625 (8th Cir.1989) (applying both *Allis–Chalmers Corp.* and *Lingle* in support of the conclusion that a loss of consortium claim cannot bootstrap a preempted cause of action). As such, the Court recommends granting summary judgment on Count Eight as well.

## V. CONCLUSION

For the foregoing reasons, this Court recommends that the Defendants' motion for summary judgment be ALLOWED with re-gard to all of the Plaintiffs' remaining claims (Counts Four, Five, Six and Eight).[8]

Dated October 25, 1995.

suant to this Report and Recommendation. See *Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); and *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983). See also *Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 474 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

---

8. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pur-