VOLTERRA, J.
INTRODUCTION
Plaintiffs, John Finlay (Finlay) and Charles Tamulonis (Tamulonis), brought this action against their former employer, defendant Fischbach and Moore, Inc. (Fischbach), and John G. Molnar (Molnar), a Fischbach supervisor, after Molnar terminated their employment with Fischbach. Defendants now move for summary judgment against both plaintiffs on all counts. Plaintiffs oppose the motion. For the reasons set forth below, defendants’ motion for summary judgment is allowed in part and denied in part.
BACKGROUND
Read in a light most favorable to plaintiffs as the nonmoving parties, see Finney v. Madico, Inc., 42 Mass.App.Ct. 46, 47 (1997), review granted 424 Mass. 1107 (1997), the summary judgment record reveals the following: Fischbach is an electrical contractor with operations throughout the United States. Fischbach is the filed sub-bid electrical contractor on the Massachusetts Water Resources Authority (MWRA) Boston Harbor Project on Deer Island. These projects include Contract Packages 103 and 202 (CP-103 and CP-202) which are lump-sum subcontracts. In association with the Deer Island project, Fischbach entered into a collective bargaining agreement (CBA) with Local 103 of the International Brotherhood of Electrical Workers (IBEW); the CBA incorporated the Project Labor Agreement on the Boston Harbor Project into its terms. The CBA contained a provision, §6.5, stating that the employer may discharge employees for “proper cause.”
Molnar is the Project Director of the Deer Island projects. Fischbach hired Finlay in February 1993 as project manager for CP-202. In May 1992 Fischbach hired Tamulonis as a journeyman. Tamulonis is a member of Local 103 and is therefore covered by the CBA. In the fall of 1992, Tamulonis was promoted to general foreman on CP-103.
Tamulonis’ responsibilities as general foreman included completing company timesheets for the electricians whom he supervised. The timesheets noted the number of hours worked for each electrician and the particular project on which he or she worked.
The MWRA required all subcontractors to submit a weekly report known as a “Work Force Utilization Report” (WFU Report) which the MWRA used to identify ethnicity. The WFU Report states that “(t]he willful falsification of the above statements may subject the Contractor or Subcontractor to civil or criminal prosecution.” Instead of completing a WFU Report, Fischbach generally attached a copy of its weekly internal company payroll to the WFU Report form. The payroll attached to the WFU Report form was referred to as a “certified payroll” as it was signed under the pains and penalties of perjury. The certified payroll indicated the number of hours that each employee worked and the applicable job number for which the employee worked. The timesheets completed by the general foremen were the source of the information used to generate the certified payroll.
In late 1993 or early 1994, Molnar ordered Tamulonis to falsify information on timesheets he prepared in the course of his duties as general foreman. Specifically, Molnar instructed Tamulonis to allocate some of the time that his men worked on CP-103 to different projects, either CP-202 (Finlay’s project) or CP-105. Molnar threatened to fire Tamulonis if he were to reveal these instructions. Tamulonis prepared the timesheets as Molnar directed for approximately three or four months, but eventually Tamulonis refused to sign some of the timesheets.
On March 22, 1994, Finlay discovered the false timesheets by noticing that there were hours being charged to CP-202 for personnel who never worked on CP-202. Over the next few days, Finlay reviewed the timesheets with another employee, Jack Walsh, and discussed the issue with another project manager, Jimmy O’Keefe. On Friday, April 1, 1994, Finlay reviewed the certified payrolls for January through March of 1994 and again observed that time worked on other projects was being charged to CP-202. On this day, Finlay confronted Tamulonis about the certified payroll and Tamulonis responded that Finlay should see Molnar about the problem.
Molnar terminated both Finlay and Tamulonis by Wednesday of the following week.
Sometime in late 1996, one of Finlay’s prospective employers, Steven Dodge (Dodge) of Dodge Electric, contacted Molnar as a reference for Finlay. During a phone conversation, Molnar allegedly made several disparaging comments about Finlay including the following: Finlay was the last guy in the world Dodge would want to hire; Finlay sued F&M for wrongful termination; Finlay was incapable of handling his duties as project manager and his duties were assumed by a more experienced man; Finlay filed a worker’s compensation claim and dragged F&M *141 through the muck regarding the claim; and, Finlay went out on unemployment compensation.
Disputed Facts
There remain material facts in dispute including: 1) whether Fischbach stood to gain anything or make any money by tampering with timesheets[3] and 2) the extent of William Greene’s knowledge of Molnar’s scheme (Greene is another Fischbach employee); and 3) promises made to Finlay regarding the duration of his employment.
DISCUSSION
1. Summary Judgment Standard
Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). Defendants, as the moving parties, bear the burden of affirmatively demonstrating the absence of a triable issue; and further, that they are entitled to judgment as a matter of law. Pederson v. Time, 404 Mass. 14, 17 (1989). If defendants establish the absence of a triable issue, plaintiffs, as the parties in opposition to the motion, must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat the motion. Id. With respect to any claim which defendants do not have the burden of proof at trial, they may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of plaintiffs’ case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “(T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
2. Section 301 Preemption as to Tamulonis
Defendants contend that several of Tamulonis’ claims are preempted by §301 of the Labor Management Relations Act, 29 U.S.C. §185(a)[4] because hewas covered by a CBA during his employment. “It is well established that §301 completely preempts a state law claim if the resolution of the claim necessitates analysis of, or substantially depends on the meaning of,-a collective bargaining agreement.” Quesnel v. Prudential Ins. Co., 66 F.3d 8, 10 (1st Cir. 1995), citing Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985); Magerer v. John Sexton & Co., 912 F.2d 525, 528 (1st Cir. 1990). There is no dispute that Tamulonis was subject to the applicable CBA among Fischbach, the MWRA, and Local 103. Therefore, the question is whether the resolution of his claims requires analysis of, or substantially depends upon the meaning of, the CBA. Quesnel, 66 F.3d. at 11. “(I]n order to determine whether a particular state-based cause of action is preempted by §301, a court must analyze the specific elements of the state-based claim." Cullen v. E.H. Friedrich Co., Inc., 910 F.Supp. 815, 820 (D.Mass. 1995).
a. Breach of Contract/Promissory Estoppel — Count II
Tamulonis
Defendants contend that Tamulonis’ breach of contract claim is clearly preempted. The court agrees. Resolution of any breach of contract would necessarily require consideration of whether Tamulonis was discharged for proper cause, which implicates the Managements Rights Provision, §6.5 of the CBA.
Tamulonis’ argument that Fischbach made individual promises to him and that his claims are based on the individual promises rather than the CBA is unsupported by the record. The record conclusively shows that the terms and conditions of Tamulonis’ employment were governed by the CBA at all times.
Tamulonis further argues that he had a fundamental state law right to work without being asked to commit a crime. However, the cases cited by Tamulonis are distinguishable from the circumstances here as these cases involve statutory claims not alleged by Tamulonis here. See e.g. Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974); Blanchette v. School Committee of Westwood, 427 Mass. 176 (1998). Moreover, resolution of this claim is not a purely factual determination because it requires interpretation of the CBA’s “proper cause” provision. See Lueck, 471 U.S. at 211.
Tamulonis’ promissory estoppel claim is likewise preempted for any promise made to Tamulonis by Fischbach would be governed by the CBA.
Finlay
Finlay’s deposition testimony shows that Fischbach, through William Greene, made representations to him that he was being hired for as long as there was work or about four years. Greene’s deposition testimony states that no one ever told Finlay that he would be employed as long as they had work to do on the island. Thus, there is a genuine issue of material fact as to Fischbach’s representations to Finlay about the anticipated duration of his employment and summary judgment is inappropriate. Monaco v. Lombard Bros., Inc., 24 Mass.App.Ct. 941 (1987).
Fischbach argues that this alleged oral contract is barred by the statute of frauds. The court rejects Fischbach’s argument because Massachusetts recognizes an oral contract for employment of an unlimited duration, which may be the case here, but must be determined by the trier of fact. Serení v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 428, 434 (1987), citing Carnig v. Carr, 167 Mass. 544 (1897).
*142 The court also rules that summary judgment is not warranted as to Finlay’s promissory estoppel theory. Finlay has produced sufficient evidence to raise a genuine dispute of material fact as to whether Fischbach made him a promise upon which he reasonably relied to his detriment. See Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 442 (1992), quoting Restatement Second of Contracts, §90. Finlay and Greene offer different accounts as to any promises made during Finlay’s interview. In addition, Finlay curtailed a real estate business and his own electrical company to join Fischbach, but the extent of the detriment is factually disputed. Thus, summary judgment is denied on Finlay’s promissory estoppel theory.
b. Tortious Interference with Advantageous and/or Contractual Relations — Count III
To establish a claim of intentional interference with contractual relations, each plaintiff must show; 1) he had a contract with a third party; 2) Molnar knowingly induced the third party to breach the contract; 3) Molnar’s interference was improper in motive or means; and 4) plaintiffs were harmed by defendant’s actions. United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-17 (1990); Jenkins v. DeTucci, 41 Mass.App.Ct. 176, 182-84 (1996), review denied 423 Mass. 1111 (1996).
Tamulonis
The determination of whether Molnar induced Fischbach to break its employment contract with Tamulonis would require the court to decide whether Fischbach was entitled to discharge Tamulonis under the CBA. Magerer, 912 F.2d at 531. Thus, Tamulonis’ interference with contractual relations claim is preempted by §301.
However, the claim for interference with advantageous relations is distinct from any contractual agreement between Tamulonis and Fischbach. Nolan and Sartorio, Massachusetts Practice Series, Tort Law, Vol. 37, §98 (1989 ed.), citing In re Scallywags, Inc., 84 B.R. 303 (Bkrtcy.D.Mass. 1988). As such, the court need not look to the CBA in resolving this claim and therefore, it is not preempted. But, “an employee’s supervisor is privileged to act as he did unless he acted out of malevolence, that is, with actual malice . . . malevolence is for a spiteful, malignant purpose, unrelated to the legitimate corporate interest.” Boothby v. Texon, 414 Mass. 468, 487 (1993) (internal quotations omitted). Molnar admits to ordering Tamulonis to keep inaccurate timesheets, but maintains that it was the simplest way in which to balance the cost between two jobs, CP-202 and CP-103. Whether Molnar’s actions and intentions were related to the legitimate corporate interest, and thus privileged, is a genuine issue of material fact for the fact finder to resolve. Therefore, Tamulonis’ claim for interference with advantageous relations survives summary judgment.
Finlay.
Finlay has produced sufficient evidence on each element of these claims to defeat summary judgment. Therefore, defendants’ motion is denied as to Finlay’s claims for interference with advantageous and/or contractual relations.
c. Wrongful Termination — Count IV Tamulonis
It is undisputed that Tamulonis was covered by the applicable CBA here. Therefore, the public policy exception to the employment at will doctrine does not apply to him.[5] Cullen, 910 F.Supp. at 821 (“[a]llowing employees governed by a CBA to assert an independent common law claim of wrongful discharge would not be a commendable practice. It would deprive employer and union to establish a uniform and exclusive method for orderly settlement of employee grievances”), citing Azzi v. Western Electric Co., 19 Mass.App.Ct. 406, 410 (1985), quoting Republic Steel Corp. v. Maddox, 379 U.S. 650, 653 (1965). Consequently, Tamulonis’ claim for wrongful termination fails.
In addition, §301 preempts this claim as its resolution depends upon an interpretation of the “proper cause” provision in the CBA. Cullen, 910 F.Supp. at 822-23, discussing Quesnel, 66 F.3d at 10. As a result, Fischbach is entitled to summary judgment as to Tamulonis’ claim for wrongful termination.
Finlay
Fischbach asserts that Finlay cannot state a claim for wrongful discharge in violation of public policy because first, there is no evidence to support his claim and secondly, because Fischbach has not violated any public policy.[6]
“[I]n certain circumstances, an at-will employee may maintain an action against [his] former employer for wrongful discharge.” Shea v. Emmanuel College, 425 Mass. 761, 762 (1997), citing Upton v. JWP Businessland, 425 Mass. 756, 757 (1997). Finlay must show that he was an at-will employee who was terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do what the law forbids. Folmsbee v. Tech Tool, Grinding & Supply, Inc., 417 Mass. 388, 394 (1994); Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149 (1989).
Here, Finlay discovered the inaccurate timesheets on March 22, 1994. Finlay discussed the issue with other employees, Jack Walsh and Jimmy O’Keefe, over the next few days. On Friday, April 1, 1994, Finlay reviewed the certified payrolls and found the same inaccuracies. On this same day, Finlay confronted Tamulonis about the certified payroll and Tamulonis responded that Finlay should see Molnar about the problem. Finlay testified at his deposition that from the time of the initial discovery on March 22 through his termination, he was attempting to ascertain the *143 origin of the inaccuracies and figure out how to handle the problem.
The court rejects Fischbach’s contention that because Finlay had not yet spoken to his supervisors or decided what to do that his claim for wrongful discharge fails. Based upon Molnar’s threats to terminate Tamulonis if he told anyone about the timesheets and based upon the close temporal proximity of the firing of Tamulonis and Finlay, a reasonable inference may be drawn that Molnar was aware that Finlay had learned about the inaccuracies and was preparing to blow the whistle on Molnar. At least in the context of this case, the court sees no meaningful distinction between an employee fired for already having blown the whistle and an employee who is perceived as about to blow the whistle.
At any rate, Finlay did discuss the problem with other Fischbach employees and project managers, albeit not supervisors. An internal complaint made about the alleged violation of criminal law states a recognized public policy exception. Shea, 425 Mass. at 762-63; Smith v. Mitre Corp., 949 F.Supp. 943, 950 (D.Mass. 1997) (“blowing the whistle on fraud and false claims by a government contractor — even when that whistleblowing is confined within the company— is sufficiently important to command the invocation of the exception”). In this case, it is unclear whether Fischbach could financially profit by submitting the inaccurate timesheets; Fischbach’s relentless argument that the contracts were fixed-price contracts appears to be a classic red herring. What is clear is that the WFU Report on it face prohibits falsification of the timesheets and warns contractors and subcontractors of criminal and civil penalties for a violation. This is adequate to invoke the exception. Accordingly, Finlay has stated a claim for wrongful termination in violation of public policy and summary judgment is denied on this claim.
d. Civil Conspiracy — Count V
The elements of civil conspiracy are a common design or agreement between two or more people to commit a wrongful act and some tortious act done in furtherance of the agreement. Aetna Casualty Surety Company v. P&B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994); see also Restatement (Second) of Torts, §876 (1977).[7]
Tamulonis and Finlay
Fischbach contends that resolving this claim requires determining whether Tamulonis’ termination was a tortious act or breach of duty under the CBA. However, the tortious act here could be viewed as more than the ultimate termination. That is, Molnar’s instructions to Tamulonis to prepare inaccurate timesheets may be the tortious act in itself. Thus, no reference to the CBA’s “proper cause” provision would be necessary and there is no §301 preemption.
Nevertheless, there is no evidence of a combination, or common design or agreement, between Molnar and anyone else at Fischbach. Kyte v. Philip Morris, Inc., 408 Mass. 162, 166-67 (1990). Tamulonis’ argument that William Greene’s knowledge of the situation suffices to state a claim for civil conspiracy is untenable. Id. at 168. Accordingly, Fischbach is entitled to summary judgment on this claim as to both plaintiffs.
e. Defamation as to Finlay
Finlay claims that Molnar and Fischbach made defamatory statements to prospective employers. The record contains a letter from a prospective employer, Steve Dodge of Dodge Electric, detailing a conversation that he had with Molnar about Finlay. During this conversation, Molnar allegedly made several derogatory remarks about Finlay. Defendants argue that they are entitled to summary judgment because Molnar’s statements were either true, his opinions, or privileged and that, in any event, Finlay suffered no damage from the statements because Dodge offered him a position.
Summary judgment is favored in defamation cases. Mulgrew v. Taunton, 410 Mass. 631, 632 (1991). Defamation, or in this case slander per se, is the publication of a defamatory statement of or concerning the plaintiff which is false and causes damage to the plaintiff. McAvoy v. Shufrin, 401 Mass. 593, 597 (1988); Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 348 (1943). “Statements of fact may expose their authors ... to liability for defamation, but statements of pure opinion cannot. Statements of pure opinion are constitutionally protected.” King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987), U.S. cert. denied 485 U.S. 940 (1988), citing Aldoupolis v. Globe Newspaper Co., 398 Mass. 731, 733 (1986). “(W]hether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion.” King, 400 Mass. at 709. The court rules that Molnar’s alleged statements to Dodge were either true or pure opinion. See Aldoupolis, 398 Mass. at 733 and cases cited. Therefore, defendants are entitled to summary judgment on this claim.[8]
e. Tortious Misrepresentation — Count I
As to Count I, plaintiffs must show that Fischbach or Molnar made a false representation of material fact with knowledge of its falsity for the purpose of inducing them to act thereon and that they reasonably relied upon the representation and were damaged. Macoviak v. Chase Home Mortgage Corp., 40 Mass.App.Ct. 755, 760 (1996) (citations omitted). Based on the reasonable inferences the court may draw from the record, plaintiffs have raised genuine issues of material fact to defeat defendants’ summary judgment motion on this claim.
Tamulonis and Finlay
Tamulonis and Finlay discussed the responsibilities of their respective jobs of general foreman and *144 project manager with Molnar and Greene in the promotion or hiring process. During these discussions, Molnar never disclosed that he expected Tamulonis to keep inaccurate timesheets as part of his responsibilities. Similarly, Molnar did not tell Finlay that he would have to refrain from whistleblowing in order to keep his job. Defendants argue that Molnar could not have knowingly made these false omissions when plaintiffs were hired or promoted because the alleged illegal activity did not occur until much later, in 1993 and into 1994. From Molnar’s deposition testimony, one could infer that Molnar had used this procedure of falsifying timesheets before in lieu of a longer and more difficult procedure of completing material transfer paperwork. This raises disputes of material fact for resolution at trial on plaintiffs’ claims for tortious misrepresentation and summary judgment is therefore denied.
4. Garmon Preemption as to Tamulonis
In the alternative, defendants argue that they are entitled to summary judgment on Tamulonis’ claims for wrongful termination, interference with contractual relations, and civil conspiracy based on Garmon preemption. Although the court has ruled these claims are preempted by §301, I address this argument.
“When an activity is arguably subject to §7 or §8 of the National Labor Relations Act, the states as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of the state interference with national labor policy is to be averted.” San Diego Unions v. Garmon, 359 U.S. 236, 245, 79 S.Ct 773, 779-80 (1959). Only if the conduct at issue is of “peripheral concern” to federal labor law and policy or touches interests “so deeply rooted in local feeling in responsibility” are states left with the power to act. Id.; Chaulk, 70 F.3d 1361 (1995), cert. denied 116 S.Ct 2525 (1st Cir. 1996).
Here, assuming without deciding that Tamulonis’ conduct is arguably protected by §7 or Molnar’s conduct is arguably prohibited by §8 of the National Labor Relations Act, Tamulonis’ contention that his claims fall within the Garmon exceptions is persuasive. In determining whether the “peripheral concern” or “local interest” exceptions apply, courts balance the state’s interest in remedying the effects of the challenged conduct against both the interference with the NLRB’s ability to adjudicate the controversy and the risk that the state will approve conduct that the NLRA prohibits. Chaulk, 70 F.3d at 1365 (citations omitted). In applying this test, courts focus on the root of the controversy, as opposed to its label and look to the “conduct being regulated, not the formal description of governing legal standards.” Id.
In the instant case, the state has a great interest in remedying the effect of the challenged conduct, that being the falsification of documents submitted to a state entity. This interest would not interfere with the NLRB’s ability to adjudicate the issue nor would the state condone inaccuracies on timesheets. On balance, adjudicating these claims in state court poses no threat to disrupting the uniform body of federal labor law underlying the Garmon preemption doctrine. Consequently, the claims of wrongful termination, intentional interference with contractual relations, and civil conspiracy are not subject to Garmon preemption.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ motion for summary judgment against plaintiff Tamulonis is ALLOWED as to Breach of Contract/Promissory Estoppel (Count II), Interference with Contractual Relations (part of Count III), Wrongful Termination (Count IV), and Civil Conspiracy (Count V) and DENIED as to Tortious Misrepresentation (Count I) and Interference with Advantageous Relations (part of Count III).
It is further ORDERED that defendants’ motion for summary judgment against plaintiff Finlay is ALLOWED as to Civil Conspiracy (Count V) and Defamation (Count VI) and DENIED as to all other remaining claims (Counts I, II, III, and IV).

Finlay testified that despite their lump-sum contracts with the MWRA Fischbach could profit from certain change orders and claim work, which could potentially involve retrieving timesheets to determine labor costs.
Molnar claims that he ordered the changes in the timesheets as a means to balance the materials ordered for CP-103 but used by CP-202.

Section 301 provides:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined by this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without respect to the citizenship of the parties.

As discussed above, the court rejects Tamulonis’ argument that he had any individual contract with Fischbach independent of his rights under the CBA.

Fischbach aptly points out that if Finlay establishes that he had a contract with Fischbach, he would not be an employee at-will, and thus, unable to recover under a wrongful discharge theory. However, the question of whether Finlay had a contract with Fischbach must be determined at trial. For purposes of this argument only, the court assumes that Finlay was an at-will employee.

There are no allegations in the complaint to support a civil conspiracy claim based on a coercion theory. Aetna, 43 F.3d at 1564.

 I reject defendants argument that Molnar’s statements were protected by a conditional privilege because Molnar unnecessarily, unreasonably, and recklessly abused the privilege during his conversation with Dodge. Foley, 400 Mass. 82, 94-95 (1987).
Further, I note that had this claim survived summary judgment, it is doubtful whether Finlay could show any damages. Finlay testified at his deposition that Dodge offered him a position with his company despite Molnar’s statements and that he refused the position because it required extensive traveling.