**Andrew SEYMORE, Plaintiff,**

v.

**LAKE TAHOE CRUISES, INC., Joseph Thiemann, Defendants.**

**No. CIV–S–93–1482 DFL JFM.**

United States District Court, E.D. California.

June 6, 1995.

**1031**

Mark E. Merin and J. Scott Smith, Sacramento, CA, for plaintiff.

Robert L. Tamietti, Truckee, CA, for defendants.

### MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

On September 25, 1992, plaintiff Andrew Seymore was terminated from his employment as a captain with defendant Lake Tahoe Cruises Inc. after he refused defendant Joseph Thiemann's[1] order to take the *Tahoe Queen*, a 500 passenger vessel, on its morning cruise. Seymore brings this action for wrongful termination under 46 U.S.C. § 2114(a),[2] federal maritime law, and state law. Seymore claims that he refused Thiemann's order because the *Tahoe Queen* was in an unsafe condition and because to take the vessel out would have violated a Coast Guard order. Defendants now move for partial summary judgment. The motion is granted in part and denied in part.

### I

In 1988, Lake Tahoe Cruises, Inc. hired plaintiff Seymore, who holds a captain's license from the Coast Guard, to serve as one of the captains of the *Tahoe Queen*.[3] By

---

1. Defendant Thiemann is the President, Secretary, Treasurer and sole shareholder of Lake Tahoe Cruises, Inc.

2. The whistle-blower statute protecting seamen who report statutory or regulatory violations to the Coast Guard.

3. Because this is a motion for summary judgment, all facts reasonably supported by evidence in the record are construed in plaintiff's favor.

**1032**

1990 Seymore was promoted to "Operations Director." His duties included supervising the other captains as well as supervising the maintenance of the *Tahoe Queen* and the other equipment owned by Lake Tahoe Cruises. Although Seymore was subsequently replaced as Operations Director, he retained supervisory authority over the other captains.

On August 24, 1992, the Coast Guard inspected the *Tahoe Queen.* At that time, the inspector noted hairline cracks in the "lexon" glass plates in the boat's glass bottom viewing area. The Coast Guard ordered the plates to be replaced by temporary steel plates before the vessel could be taken out on the lake. The order further stated that permanent replacement of the lexon plates had to be completed "to the satisfaction of the attending marine inspector." (Coast Guard Order, Ex. E to Pl.'s P. & A.)

The night of August 24, 1992, temporary steel plates were installed in the *Tahoe Queen.* Despite that water was leaking into the glass bottom area, the boat was taken on its cruise the next morning after Thiemann told Seymore that the Coast Guard had approved the voyage. Later that day, the captain piloting the vessel called Seymore to inform him that the boat was listing. Seymore ordered the boat to return to port and called the Coast Guard. (Seymore Decl. ¶ 13.) The inspector, Lee Poland, became angry and denied that he had given Thiemann permission for the boat to be taken out while water was leaking into the glass bottom area.

During the night of September 24, 1992, the temporary steel plates in the glass bottom area of the *Tahoe Queen* were replaced with the new lexon glass plates. The next morning, Thomas Evanow, the captain who was scheduled to pilot the morning cruise,

called Seymore to complain that the repairs were incomplete and that the vessel should not be taken out. Seymore arrived at the vessel and found the glass bottom area filled with water; indeed, water was coming in as quickly as it could be pumped out. Divers informed Seymore that they had sheared off one or two of the securing bolts for the lexon plates, causing additional leakage. Seymore feared that his license would be at risk if he took the vessel out in derogation of Poland's order, and he believed that the boat should not be operated while the glass bottom area was leaking. He notified Thiemann that neither he nor Evanow would take the vessel out, and that he would not order another captain to pilot the morning cruise. (Seymore Decl. ¶¶ 16–18.)

Despite Seymore's admonition that Thiemann would "be in trouble with the Coast Guard if we sail this boat the way it is," (Seymore Dep. at 103:9–11), Thiemann decided to take the vessel out himself. He advised Seymore and Evanow over the radio that they were fired. He also told Seymore, in a sarcastic tone, to go ahead and call the Coast Guard. (Seymore Decl. ¶¶ 20, 24.)

On September 14, 1993, Seymore filed this action. Seymore's complaint alleges four claims. The first is a claim for relief under § 2114, which protects seamen against discrimination based on reporting violations of shipping statutes or regulations to the Coast Guard.[4] The second and third claims are for breach of implied contract and breach of an implied covenant of good faith and fair dealing. The fourth claim is for wrongful termination in violation of public policy. Both defendants move for summary judgment as to the first and fourth claims, arguing that on the undisputed facts Seymore has no right to recover on these claims. As to the contract claims, only Thiemann moves for summary

4. This section provides in full:
   (a) An owner, charterer, managing operator, agent, master, or individual in charge of a vessel may not discharge or in any manner discriminate against a seaman because the seaman in good faith has reported or is about to report to the Coast Guard that the seaman believes that a violation of this subtitle, or a regulation issued under this subtitle, has occurred.

   (b) A seaman discharged or otherwise discriminated against in violation of this section may bring an action in an appropriate district court of the United States. In that action, the court may order any appropriate relief, including—
   (1) restraining violations of this section; and
   (2) reinstatement to the seaman's former position with back pay.
   46 U.S.C. § 2114.

judgment; he argues that he cannot be individually liable on these claims.

## II

■ Defendants move for summary judgment as to Seymore's first claim, his whistle-blower claim under 46 U.S.C. § 2114. The basis for the motion is defendants' argument that Seymore was terminated not because he threatened to, and did, report safety violations to the Coast Guard, but rather because he refused to take the ship out for its morning cruise.

■ If defendants' sole reason for firing Seymore were his refusal to pilot the *Tahoe Queen,* and not his reports to the Coast Guard, then Seymore would not state a claim under § 2114. By its plain language, § 2114 applies only in cases where a seaman is discriminated against "*because* the seaman in good faith *has reported or is about to report* to the Coast Guard that the seaman believes that a violation of [the shipping statutes or regulations] has occurred." 46 U.S.C. § 2114(a) (emphasis added). If Seymore's past reports and his threatened report to the Coast Guard played no part in defendants' decision to terminate him, this section would not apply.

■ This would be so even if, as Seymore claims, taking the vessel out would have violated a Coast Guard order.[5] As the Fifth Circuit has noted, § 2114's purpose "is to promote compliance with maritime statutes and regulations by encouraging seamen ... to make reports to the Coast Guard without fear of termination or other reprisals." *Garrie v. James L. Gray, Inc.,* 912 F.2d 808, 812 (5th Cir.1990).[6] The section, however, does not seek to turn seamen into private enforcers of Coast Guard regulatory decisions. Thus, although § 2114 was patterned after the whistle-blower statute at 29 U.S.C. § 660(c) of the Occupational Safety and Health Act (OSHA),[7] § 2114(a) is worded more narrowly than § 660(c). Section 660(c) proscribes retaliatory discrimination in three broad categories: (1) because an employee has instituted any proceeding under or related to the statute; (2) because an employee has testified or is about to testify in any such proceeding; or (3) "because of the *exercise by [an] employee on behalf of himself or others of any right afforded by [OSHA]."* 29 U.S.C. § 660(c) (emphasis added).[8] The "exercise ... of any right" language in OSHA has been found to support a regulation providing that an employer may not fire an employee for refusing to perform dangerous work if the employee has a reasonable apprehension of death or serious injury. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980).[9] By contrast, despite being drafted with § 660(c) in mind, § 2114(a) contains no language protecting a

---

5. Whether a valid Coast Guard order was actually violated cannot be determined from the summary judgment record.

6. To date, *Garrie* is the only reported case interpreting § 2114. In *Garrie,* the court held that a plaintiff was not protected by § 2114 when he merely inquired about Coast Guard rules rather than reporting a violation. *Id.* at 812–13.

7. S.Rep. No. 454, 98th Cong., 2d Sess. 12 (1984), reprinted in 1984 U.S.C.C.A.N. 4831, 4842. The Senate Report indicates that § 2114 was passed in response to the Fifth Circuit's holding in *Donovan v. Texaco,* 720 F.2d 825 (5th Cir.1983), that OSHA did not protect a seaman who reported to the Coast Guard. The legislative history indicates that § 2114 creates "a private right of action similar but not identical to that in [OSHA § 660(c)]."

8. Section 660(c)(1) provides in full:
No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.
29 U.S.C. § 660(c)(1).

9. The whistle-blower statute in the Federal Mine Safety and Health Act, 30 U.S.C. § 815(c)(1), contains similarly broad "any statutory right" language and has likewise been interpreted to provide a right to refuse an employer's order to perform unreasonably hazardous work. *See, e.g., Gilbert v. Federal Mine Safety & Health Rev. Comm'n,* 866 F.2d 1433, 1439 (D.C.Cir.1989). And in stark contrast to § 2114(a), the whistle-blower statute in the Energy Reorganization Act, 42 U.S.C. § 5851(a), specifically provides an employee right to refuse to engage in activity made unlawful by the Act. 42 U.S.C. § 5851(a)(1)(B).

seaman in the exercise of "rights afforded" by the shipping statutes; it provides only a narrow protection for reporting violations to the Coast Guard.[10] In short, the language of § 2114(a) does not provide a remedy to a seaman who refuses a management directive on the ground that following the directive would violate a Coast Guard order or regulation. By its plain language, § 2114 does not entitle Seymore to more protection than a captain who, without first making a report, receives an order from the Coast Guard and refuses an employer's order to disobey it.

■■■ Thus, defendants will prevail as to Seymore's § 2114 claim if they can establish that Seymore was terminated solely because he disobeyed Thiemann's order to take the *Tahoe Queen* on its morning cruise, and not because of his past or threatened reports to the Coast Guard. Although the question has not been briefed, it appears that this determination would be made using the "dual motive" analysis of *Mount Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159, 1163–64 (9th Cir.1984) (applying dual motive analysis in 42 U.S.C. § 1581 whistle-blower case). Under this analysis, it is plaintiff's initial burden to show that an illegal motive played some part in the discharge; to avoid liability the employer must then prove that it would have discharged the employee even if the employee had not engaged in protected conduct. *Id.*

When this analysis is applied to the summary judgment record here, a disputed question of fact arises as to whether Seymore's reporting to the Coast Guard played a role in Thiemann's determination to fire him. Defendants argue that Seymore has admitted that he was fired solely because of his refusal to pilot the vessel, not because of reporting to the Coast Guard. The primary basis for this contention is Seymore's response to Defendants' Interrogatory No. 4, which states:

> On September 25, 1992, Joe Thiemann told me to contact "whoever I had to contact" regarding the leak in the Tahoe Queen, and fired me for refusing to pilot

the vessel. Subsequently, in a conversation with Mr. Thiemann, Mr. Thiemann told me that his previous statement was intended to be sarcastic, that my phone calls to the Coast Guard "screwed things up," that he didn't want me to call the Coast Guard and wished I hadn't done so. These statements led me to conclude that I was fired, in part, because I intended to and did, in fact, contact the Coast Guard.

(Pl.'s Response to Defs.' First Set of Interrogs., Ex. B to Tamietti Decl., at 2.) Nothing in this response or in Seymore's deposition testimony constitutes a concession that Seymore was not terminated on September 25, 1992 in part because of his past or threatened reports to the Coast Guard. Indeed, the interrogatory response just quoted is itself sufficient to create a genuine issue of fact on this point. The motion for summary judgment as to Seymore's § 2114 cause of action is denied.

### III

■ Defendants also move for summary judgment as to Seymore's wrongful termination claim based upon federal maritime law. Seymore argues that his refusal to pilot the vessel derived from his belief that the vessel was unseaworthy, posing an unreasonable risk to passengers and crew. In these circumstances, Seymore suggests that if § 2114 provides no remedy, the general maritime law should provide a wrongful termination cause of action, because the discharge of a captain for refusing to pilot a vessel that he reasonably believes is unseaworthy violates public policy.

■■■ Absent a contractual agreement to the contrary, a seaman's employment is generally terminable at will. *See Smith v. Atlas Off-Shore Boat Serv., Inc.,* 653 F.2d 1057, 1060 (5th Cir.1981). In some circumstances, however, a court sitting in admiralty will recognize a wrongful termination cause of action when the termination violates an important public policy. Thus, in *Smith,* the leading case in this area, the court held that a seaman who was fired in retaliation for

---

**10.** The two statutes also differ in that § 2114 provides a private right of action while § 660

requires the Secretary of Labor to bring the action.

filing a personal injury action under the Jones Act[11] could bring a wrongful termination claim under the general federal maritime law.[12] On the other hand, where the public policy implicated by an employee's termination is weak, stemming from a regulatory statute that could readily be enforced by the Coast Guard, a wrongful termination cause of action will be denied. Therefore, a seaman who is terminated for refusing an employer's directive to pilot a towing vessel for more than twelve hours per day has no wrongful termination claim even though following the order would violate 46 U.S.C. § 8104(h). *Feemster v. BJ–Titan Services Co.*, 873 F.2d 91, 93 (5th Cir.1989).[13] In such a case there is time for the seaman to contact the Coast Guard, and it is reasonable to leave enforcement of the safety statute to the Coast Guard without creating a private right of action. *Id.*

In the present case, the public policy involved is stronger than the policy held sufficient to warrant a maritime wrongful termination cause of action in *Smith;* the public interest here is in preventing a captain from taking out a vessel with a leaking hull, jeopardizing the safety of the passengers and crew. In such a case, allowing the employer to fire a captain at will for refusing to take out an unseaworthy vessel would create an incentive for the captain to risk human life in order to retain his employment. Indeed, the public policy at issue here is so strong that 46 U.S.C. § 10908 makes it a felony to send

or attempt to send to sea a vessel in an unseaworthy state that is likely to endanger the life of an individual.[14] Given the strong public policy at issue in the present case, it is appropriate to recognize a wrongful termination cause of action in favor of a captain terminated for refusing to pilot or order another to pilot a vessel that the captain reasonably believes is unseaworthy, posing an undue risk of death or serious injury to passengers or crew.[15]

Turning to the summary judgment record, it appears that there is a genuine dispute as to whether Seymore reasonably believed that the vessel was unseaworthy. Defendants argue that Seymore has conceded that the vessel could safely operate even with the glass bottom area filled with water. Although Seymore made some statements in his deposition to the effect that he knew that the vessel "could operate" in this condition, (Seymore Dep. at 98), nothing he said amounts to a concession that the vessel was seaworthy. Indeed, in his deposition Seymore also indicated that he believed that the water in the glass bottom made the boat unsafe and threatened to sink the boat. (Seymore Dep. at 75:12–14, 86:20–22.) Because Seymore may be able to prove that he was terminated for refusing to pilot, or order another to pilot, the *Tahoe Queen* when he reasonably believed that it was unseaworthy, defendants' motion for summary judgment as to this claim is denied.[16]

---

11. 46 U.S.C. app. § 688.

12. *Id.* at 1062–66; *accord Merchant v. American Steamship Co.*, 860 F.2d 204, 210–11 (6th Cir. 1988); *Roberson v. Rebstock Drilling Co.*, 749 F.2d 1182, 1183–84 (5th Cir.1985).

13. *Accord Meaige v. Hartley Marine Corp.*, 925 F.2d 700, 702 (4th Cir.1991); *Garrie v. James L. Gray, Inc.*, 912 F.2d 808, 812–13 (5th Cir.1990).

14. *See also* 46 U.S.C. § 2302(a) (imposing civil penalty upon person operating vessel in negligent manner).

15. At oral argument, defendants conceded that Seymore could state a federal maritime wrongful termination claim, but argued that he could recover only if he proved that the vessel was actually unseaworthy. However, because the public policy here vindicated involves risks to human life and because the captain of a vessel is traditionally responsible for making determinations as

to the vessel's integrity, it is appropriate to apply a standard of "reasonable belief" to the captain's determination of unseaworthiness. In this way the cause of action here recognized is similar to those recognized under OSHA and the Federal Mine Safety and Health Act allowing employees to refuse to perform work that they reasonably believe is unsafe. *See, e.g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 3, 100 S.Ct. 883, 886, 63 L.Ed.2d 154 (1980); *Gilbert v. Federal Mine Safety & Health Rev. Comm'n*, 866 F.2d 1433, 1439 (D.C.Cir.1989). Thus, if at the time he refused to take out the *Tahoe Queen* Seymore reasonably believed that the vessel was unseaworthy, he may recover even if it was later determined that he was mistaken.

16. As the court permits Seymore to proceed on his federal maritime wrongful termination claim, it is not necessary to consider Seymore's fallback argument that such a claim should be permitted under state law.

## IV

■ Finally, defendant Thiemann moves for summary judgment as to Seymore's second and third claims for breach of implied contract and breach of an implied covenant of good faith and fair dealing. The basis for Thiemann's argument is that Seymore's contract was with the corporation, Lake Tahoe Cruises, and therefore Seymore may not recover against Thiemann individually. Seymore concedes that Thiemann cannot be liable on the contract claims unless Thiemann has so disregarded the corporate form that he is the alter ego of Lake Tahoe Cruises.[17]

The only evidence that Seymore provides in support of his alter ego theory is that Thiemann, the sole shareholder, manager, and director of Lake Tahoe Cruises, had sole power to declare dividends for himself and sometimes used checks drawn on Lake Tahoe Cruises' bank account to make payments for personal expenses.[18] However, Thiemann also indicated in his deposition that whenever he used corporate funds for personal purposes, it was always properly documented as a dividend or a loan. (Thiemann Dep. at 161:14–18.) Plaintiff has not contested this statement or produced any evidence that Thiemann does not repay the loans he receives from the corporation. The evidence in the record, standing alone, could not support a finding that Thiemann has so disregarded the corporate form that alter ego liability is warranted.[19]

■ Moreover, even were the court to agree with Seymore that this sparse evidence is sufficient to support a finding that Thiemann is the alter ego of Lake Tahoe Cruises, in order to pierce the corporate veil Seymore must also show that "an inequitable result will follow if the acts giving rise to liability are treated as those of the corporation alone." *Orloff v. Allman,* 819 F.2d 904, 908–09 (9th Cir.1987) (discussing California standard) (quoting *RRX Indus. v. Lab–Con, Inc.,* 772 F.2d 543, 545 (9th Cir.1985)) (internal brackets omitted). As in *Orloff,* Seymore "ha[s] not claimed that the corporation is undercapitalized or otherwise incapable of satisfying a judgment." *Id.* at 909. Nor is there any indication that Seymore was in any way a victim of fraud involving Thiemann's personal use of corporate funds or that Seymore was somehow prejudiced by Thiemann's declaration of dividends in his favor. *See id.*[20] In short, there is no evidence of any bad faith, undercapitalization, misrepresentation or fraud that would warrant imposing alter ego liability in the instant case.[21] Therefore, defendant Thiemann's motion for summary judgment as to Seymore's contract claims is granted.

## V

For the above stated reasons:

1. Defendants' motion for summary judgment as to Seymore's claim under 46 U.S.C. § 2114 is DENIED;

2. Defendants' motion for summary judgment as to Seymore's wrongful termination claim is DENIED; and

---

**17.** The parties assumed that California law would apply to the alter ego determination. Actually, there is federal common law regarding corporate veil piercing. However, the court need not decide which substantive law should apply to the contract at issue here, because the standards are functionally equivalent. *See Orloff v. Allman,* 819 F.2d 904, 909 (9th Cir.1987) (declining to decide whether California law or federal common law of alter ego liability applied in securities fraud context where result would be identical under either).

**18.** Seymore's argument that Thiemann has callously disregarded Coast Guard safety regulations is irrelevant.

**19.** *See Mid–Century Ins. v. Gardner,* 9 Cal. App.4th 1205, 1215, 11 Cal.Rptr.2d 918 (1992) (despite that individual and wife were sole owners of corporation and individual completely managed and controlled corporation, a finding that individual was alter ego of corporation could not stand absent evidence that individual "generally treated corporate assets as his own or disregarded the separate nature of the business").

**20.** *See also National Labor Relations Board v. Greater Kansas City Roofing,* 2 F.3d 1047, 1053 (10th Cir.1993) ("the showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form").

**21.** *Cf. NEC Electronics Inc. v. Hurt,* 208 Cal. App.3d 772, 777–78, 256 Cal.Rptr. 441 (1989) (veil piercing warranted where evidence demonstrated that defendant manipulated assets of company to detriment of its creditors).

3. Defendant Thiemann's motion for summary judgment as to Seymore's contract claims is GRANTED.

IT IS SO ORDERED.