Jocelyn BAETGE–HALL, Plaintiff,

v.

AMERICAN OVERSEAS MARINE
CORP., Defendant.

Civil Action No. 06–11083–RCL.

United States District Court,
D. Massachusetts.

June 11, 2009.

*Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).

Thomas H. Healy, Esq., New York, NY, for Jocelyn Baetge–Hall.

Robert P. Joy, Morgan, Brown & Joy, LLP, Boston, MA, for American Overseas Marine Corporation.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. INTRODUCTION

This cases arises under the historic admiralty jurisdiction of this Court. The plaintiff, Jocelyn Baetge–Hall ("Baetge–Hall"), brought an action against the defendants General Dynamics Corporation ("General Dynamics") and American Overseas Marine Corporation ("AMSEA") alleging retaliatory discharge under maritime law and intentional infliction of emotional distress.[1] Prior to her termination,

---

1. Baetge–Hall initially filed an action in the Southern District of New York against General Dynamics and AMSEA alleging retaliatory discharge pursuant to maritime law and in-

Baetge–Hall served as a chief officer overseeing cargo operations aboard a vessel entitled the *MV/2nd Lieutenant John P. Bobo* ("the *John P. Bobo*"), a maritime prepositioning ship operated by the defendants General Dynamics and AMSEA for the United States Navy's Military Sealift Command (the "Sealift Command").

General Dynamics and AMSEA filed a motion to dismiss Baetge–Hall's amended complaint. On July 2, 2007, the Court granted in part, and denied in part, this motion to dismiss. The Court dismissed the intentional infliction of emotional distress claim but held that Baetge–Hall stated a claim for retaliatory discharge under maritime law and 46 U.S.C. § 2114. The Court also ruled that Baetge–Hall's retaliatory discharge claim is not preempted under Section 301 of the Labor Management Relations Act.

Subsequently, the defendants moved to remove General Dynamics from the litigation. The Court granted the motion. AMSEA, the sole remaining defendant, now moves for summary judgment on the retaliatory discharge claim, contending that Baetge–Hall's claim is preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 187(a), and she fails to allege a public policy violation sufficient to sustain a wrongful discharge claim. Baetge–Hall filed opposition to AMSEA's motion for summary judgment and the Court heard oral argument on November 12, 2008.

## II. THE FACTUAL RECORD [2]

AMSEA, a wholly owned subsidiary of General Dynamics, operates and manages a total of 14 ships for the United States Navy ("Navy") through a contract with the Sealift Command. (Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of its Motion for Summary Judgment ["Def.'s SOF"] ¶¶ 1, 3–4.) The Sealift Command is part of the Department of Defense and provides transport of equipment, fuel, and supplies to American forces. (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ["Def.'s Reply SOF"] ¶ 5.) AMSEA operated vessels are also referred to as "merchant marine" ships. *Id.* at ¶ 6. Five of the ships managed by AMSEA for the Sealift Command are prepositioning ships. *Id.* at ¶ 3, 13. These ships transport supplies, food, and ammunition for the military. *Id.* at ¶ 14.

The Sealift Command's official policy requires that AMSEA personnel satisfy medical requirements agreed upon by Sealift Command and AMSEA. (Def.'s Reply SOF ¶ 22.) AMSEA also has vaccination policies. Where an employee fails to take a medical vaccination and such a failure is due to a valid medical deferment, there is no basis for termination for cause, the employee can be removed from the ship under a form of "mutual consent" and would avoid being marked "not fit for duty." (Plaintiff's Statement of Undisputed Material Facts ["Pl.'s SOF"] ¶ 15.) Where the refusal to be vaccinated is willful, however, the ship's captain may discharge for cause and the employee must then pay for her transportation home. *Id.*

tentional infliction of emotional distress. (Docket No. 2.) With the consent of the parties, the action was transferred from the Southern District of New York to the District of Massachusetts on June 21, 2006. (Docket No. 22.)

**2.** The factual overview is based on the parties' statements of undisputed facts and supporting affidavits; any facts in dispute are so noted. As required at the summary judgment stage, the Court draws all reasonable inferences in favor of the nonmovant. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

at ¶ 16. Baetge–Hall maintains that under maritime law and the American Maritime Officers' Union collective bargaining agreement, if someone is discharged for cause aboard a vessel, it must be documented. In addition, an official logbook entry must be submitted to the Coast Guard. (Baetge–Hall Deposition ["Baetge–Hall Dep."] 103:16–23, May 29, 2008) (Def.'s SOF, Ex. 3.)

Baetge–Hall was employed by AMSEA from August 1996 through 2003. (Def.'s SOF ¶ 7.) During her tenure with AMSEA, she held the positions of third officer, second officer, and chief officer. *Id.* at ¶ 8. Among her collateral duties was that of medical officer. In the discharge of this assignment, Baetge–Hall's official duties included keeping and updating the medical log records, including vaccination records, and submitting updated log records to the Sealift Command. (Baetge–Hall Dep. 146:5–10.) In June or July of 2003, AMSEA contacted Baetge–Hall and assigned her to serve in the Persian Gulf aboard the *John P. Bobo,* one of the maritime prepositioning ships that AMSEA operates for the Sealift Command. (Def.'s SOF ¶¶ 1, 13, 15.) Captain Donald Pigott ("Captain Pigott") commanded the *John P. Bobo* from 2000 through 2003. *Id.* at ¶ 12. Baetge–Hall had previously served as chief officer under Captain Pigott on the *John P. Bobo* during three periods, between July 2000 and November 2001, between April 2002 and July 2002, and between December 2002 and March 2003. *Id.* at ¶ 15. In a personnel evaluation of Baetge–Hall for the period of December 2002 through March 2003, Captain Pigott wrote that she did "an outstanding job this trip" and was "a pleasure to sail with." *Id.* at ¶ 16.

Baetge–Hall maintains that when she was dispatched to join the *John P. Bobo* in June or July 2003, AMSEA was aware that she did not have the anthrax and smallpox shots prescribed by the Sealift Command. (Pl.'s SOF ¶ 4.) Nevertheless, Baetge–Hall avers that Captain Pigott certified that she was "fully qualified." *Id.* at ¶ 5. Baetge–Hall asserts that in July 2003, she offered to have the vaccination shots performed at the Norfolk Naval Hospital. *Id.* at ¶ 7. In September 2003, while the *John P. Bobo* was stationed in Greece, Baetge–Hall consulted a Navy medic about taking the smallpox and anthrax vaccinations. *Id.* at ¶ 8. Baetge–Hall expressed concerns related to her history of a blood condition and her desire to become pregnant during her next leave from duty. (Def.'s SOF ¶ 23.) She claims that the Navy medic advised her not to take these vaccinations without receiving prior medical clearance. (Pl.'s SOF ¶ 8.)

On October 10, 2003, officers of the Sealift Command boarded the *John P. Bobo* to administer anthrax vaccinations to the crew. (Def.'s SOF ¶¶ 24–25.) The following day, the Sealift Command officers boarded the ship to administer smallpox vaccinations. *Id.* Baetge–Hall claims the Sealift Command's involvement was necessitated by AMSEA's failure to follow the Sealift Command's inoculation policy. (Plaintiff's Reply to the Defendant's Statement of Undisputed Material Facts ("Pl.'s Reply SOF") ¶ 4.) Baetge–Hall did not take the anthrax vaccination shot and she received a medical deferment for the smallpox vaccination. (Def.'s Reply SOF ¶ 9.) AMSEA contends that she "refused the anthrax vaccination." *Id.* She was subsequently informed that without the requisite Sealift Command vaccinations, she would have to leave the ship. (Def.'s SOF ¶ 29, 32.) AMSEA contends it decided to pay for Baetge–Hall's return to the United States and treated her departure as a "mutual consent" because she received a medical deferment on the smallpox vaccination. *Id.* at ¶ 31. Baetge–Hall and Captain Pigott signed a form indicat-

ing that she was leaving the vessel under "mutual consent." *Id.* at ¶ 32. They orally agreed that Baetge–Hall would return if she received the requisite vaccinations. *Id.*

Another crew member, Baetge–Hall's colleague, Maurice Oliver ("Oliver") was also screened out of the vaccination process. (Pl.'s SOF ¶ 20.) On October 16, Lieutenant Colonel Roy Hinman II, MD, sent an email to Captain Pigott stating that based on a medical examination, Oliver was medically deferred from receiving his smallpox vaccination. (Richard J. Williamson Affidavit, July 25, 2008 ("Williamson Aff."), Ex. 1.) The email indicates that due to the fact that Oliver may be suffering from early eczema, his smallpox immunization will be deferred until he can be "reevaluated stateside for this eczema like skin lesion." *Id.* AMSEA contends that Oliver disembarked from the *John P. Bobo* in October 2003 to be tested for hepatitis. (Def.'s Reply SOF ¶ 20.) When he returned to the ship, Oliver, Captain Pigott, and a Sealift Command officer held a meeting. *Id.* Captain Pigott received a written waiver for Oliver's vaccination shot on October 16. *Id.* Oliver was not ordered to return to the United States.

On October 18, 2003, after learning that she was being sent home, Baetge–Hall met with Oliver in her on board office. (Pl.'s SOF ¶ 20.) Oliver told Baetge–Hall his vaccination had been faked. *Id.* Baetge–Hall claims Oliver confided he had been taken to an area outside the Kuwait Naval Hospital with the commodore from the Sealift Command operating area. *Id.* There, a smallpox shot was fabricated by injecting saline into Oliver's arm and pricking it in the shape of a smallpox shot. *Id.* The commodore then drove him back to the ship and told Captain Pigott that Oliver had received his shot "wink wink." *Id.* Baetge–Hall alleges Oliver showed her

the shot fabrication marks on his arm, told her that she had "a big lawsuit on (her) hands," and asked her why she had not contacted the union, or spoken with the Captain or Richard Williamson ("Williamson"), AMSEA's Manager of Marine Personnel and Labor Relations. *Id.*

Baetge–Hall alleges that she asked Captain Pigott about Oliver's vaccination shot. (Pl.'s SOF ¶ 20.) She claims that Captain Pigott acknowledged that Oliver had not received the vaccination, as recorded in the ship's medical log, but assured her Oliver would receive it in the next port of entry. *Id.* Since her duties included maintaining the medical log records, Baetge–Hall maintains that Captain Pigott was requesting her to participate in a scheme to falsify Oliver's records in a effort to keep the government contract. (Baetge–Hall Dep. 146:1–147:5.) AMSEA, on the other hand, contends that Captain Pigott did not learn of the allegation regarding a fake vaccination until after Baetge–Hall raised it in this action. (Def.'s Reply SOF ¶ 20.)

Before leaving the *John P. Bobo* on October 19, 2003, Baetge–Hall inserted a notation on the bottom of the ship's daily menu regarding the situation stating, "Mo (Oliver) gets to stay, Joy (Baetge–Hall) has to go. The fabricated truth be sure she knows. To be continued." (Def.'s SOF ¶ 35.) Baetge–Hall testified that she told Captain Pigott that she would seek legal counsel to get her job back, "in full standing." (Baetge–Hall Dep. 93:10–14.)

Captain Pigott spoke with Williamson in AMSEA's personnel department on multiple occasions about Baetge–Hall before and after her departure from the vessel. In an internal AMSEA memorandum dated November 5, 2003, Williamson detailed all his conversations and correspondence regarding Baetge–Hall and the shots. (Def.'s SOF, Ex. 12.) Williamson noted an October 19, 2003 conversation wherein

Captain Pigott stated Baetge–Hall left a derogatory message on the bottom of the menus in the Officers Saloon, and "was making wild accusations about the Master's and company's intent with regard to her departure from the vessel." *Id.*

Baetge–Hall remained on board the *John P. Bobo* until October 19, 2003, then she returned to the United States. (Def.'s Reply SOF ¶ 13.) On October 24, 2003, Baetge–Hall spoke with Williamson. During their telephone conversation, Baetge–Hall told Williamson that AMSEA perpetuated a fraud on the Sealift Command through Oliver's falsified vaccination. (Pl.'s SOF ¶ 21; Def.'s Reply SOF ¶ 21.) Moreover, she stated she never refused the anthrax vaccination and felt she was being treated unfairly. (Def.'s SOF ¶ 40.)

On October 31, 2003, Baetge–Hall visited a physician who gave her medical clearance to take both the smallpox and anthrax vaccinations. *Id.* at ¶ 42. On November 5, 2003, Baetge–Hall called Williamson to report the news from her physician. *Id.* at ¶ 44. Williamson informed Baetge–Hall that she was terminated. He told her that the situation had changed, she had refused the anthrax shot, and that by refusing to be vaccinated, Baetge–Hall risked putting the crew and vessel at risk of being unable to operate pursuant to the Sealift Command contract. *Id.* at ¶ 45; Baetge–Hall Dep. 101:10–102:3. Williamson sent Baetge–Hall a termination letter dated December 12, 2003 stating, "Due to your refusal of the Anthrax inoculation on October 10th, 2003, your employment with AMSEA is terminated." (Def.'s SOF ¶ 46; Ex. 17.)

After being terminated, Baetge–Hall initially sought relief from her union, the American Maritime Officers' Union (the "Officers' Union"). *Id.* at ¶ 9. The Officers' Union has a collective bargaining agreement with AMSEA. *Id.* at ¶ 11.

The collective bargaining agreement provides union employees cannot be terminated without cause. *Id.* The Officers' Union denied Baetge–Hall's grievance. In a letter dated December 10, 2003, the Officers' Union stated Baetge–Hall's grievance lacked merit because the investigation revealed that she was discharged from her position due to refusing the anthrax inoculation "without explanation" on October 10, 2003. (Def.'s SOF ¶ 49; Ex. 15.)

## III. ANALYSIS

### A. Standard of Review

Summary judgment may be granted where there are no genuine issues of material fact and the movant is "entitled to judgment as a matter of law." *New Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA,* 543 F.3d 7, 11 (1st Cir.2008) (quoting Fed. R. Civ. P. 56(c)). A fact is material if has the potential to "affect the outcome of the suit under the applicable law." *American Steel Erectors, Inc. v. Local Union No. 7, Intern. Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers,* 536 F.3d 68, 75 (1st Cir.2008) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996)). Summary judgment is not appropriate where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although this Court must not to give weight to conclusory allegations or pure conjecture, it must consider the facts and inferences in the light most favorable to the nonmovant. *Cordi–Allen v. Conlon,* 494 F.3d 245, 250 (1st Cir.2007). The nonmovant may prevail against a summary judgment motion by "demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Id.* (quoting *Iverson v. City of Boston,* 452 F.3d 94, 98 (1st Cir.2006)).

## B. Federal Jurisdiction

The Constitution grants federal courts jurisdiction over cases of admiralty and maritime jurisdiction. U.S. Const. art. III, § 2, cl. 1. District courts have original jurisdiction over any civil case of admiralty or maritime jurisdiction. 28 U.S.C. § 1333(1).

## C. Admiralty Law and Retaliatory Discharge

 The notorious hardships of sea life are detailed in legend and lore. Courts and legislators alike have long acknowledged the unique challenges and vulnerabilities faced by mariners. "All who work at sea in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed." *McDermott Intern., Inc. v. Wilander,* 498 U.S. 337, 354, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). *See also Aguilar v. Standard Oil Co. of N.J.,* 318 U.S. 724, 727, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) ("From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen."); *Peninsular & Oriental Steam Nav. Co. v. Overseas Oil Carriers, Inc.,* 553 F.2d 830, 832 (2d Cir.1977) ("Although the age of sirens and cyclopes is past, the isolation and uncertainty of maritime life continue to create unique problems for sailors and courts of admiralty."). The law reflects the unique challenges of the environment. "Admiralty and maritime law includes a host of special rights, duties, rules, and procedures." *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 446, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001). Courts sitting in admiralty serve an important function in clarifying this special body of law. Federal courts have the authority to make maritime law and interpret maritime contracts. *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004). Federal courts may also reach beyond maritime precedents and, "absent a clear conflict with the federal law," apply state law. *Ellenwood v. Exxon Shipping Co.,* 984 F.2d 1270, 1278–79 (1st Cir.1993) (quoting *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 341, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973)).

 In recognition of the employment vulnerabilities faced by mariners, Congress enacted the Jones Act, 46 U.S.C.App. 688(a), in 1920 to provide seamen the ability to bring suit for personal injuries incurred due to the negligence of an employer, the vessel owner, or crew members. *Stewart v. Dutra Const. Co.,* 543 U.S. 481, 487, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). The Jones Act provides that "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 App. U.S.C. § 688. "[T]he central purpose of the Jones Act-to protect those who are particularly vulnerable to the perils of the sea as a result of their employment and who, by tradition, have been wards of the admiralty law." *Fisher v. Nichols,* 81 F.3d 319, 323 (2d Cir.1996).

 In addition to injury, employment insecurity is particularly problematic for mariners. Absent specific contractual provisions, sailors are at-will employees whose employment is "terminable at will by either party." *Smith v. Atlas Off–Shore Boat Service, Inc.,* 653 F.2d 1057, 1060 (5th Cir.1981) (quoting *Findley v. Red Top Super Markets, Inc.,* 188 F.2d 834, 837 n. 1 (5th Cir.1951)). Employees who work without a contract, commonly known as "at-will employees," are "particularly vulnerable to the preconceptions and misapprehensions that often guide the ille-

gal, unethical, or bad faith practices of some employers." *Devlin v. WSI Corp.*, 833 F.Supp. 69, 77 (D.Mass.1993).

■ In *Smith,* a seaman was fired by his employer for refusing to abandon a personal injury action he brought under the Jones Act. 653 F.2d at 1059. The Fifth Circuit held that discharging a maritime employee in retaliation for exercising his rights to bring a Jones Act claim contravenes public policy. *Id.* at 1063. "The right to discharge at will should not be allowed to bar the courthouse door." *Id.* at 1062. The Fifth Circuit specifies that the remedy was created for public policy reasons to protect sailors employed as at-will employees. *Id.* at 1062–63. "The employer should not be permitted to use his absolute discharge right to retaliate against a seaman for seeking to recover what is due him or to intimidate the seaman from seeking legal redress." *Id.* at 1062. The court also ruled that retaliatory discharge "is properly characterized as an intentional tort," and a seaman wrongfully discharged in retaliation would be entitled to compensatory damages caused by the abusive firing, including the seaman's expenses and lost earnings while finding new employment, as well as lost future earnings if the seaman's new job pays less than his previous salary. *Id.* at 1064.

■ Following *Smith,* courts have recognized wrongful discharge in violation of public policy as an exception to the at-will employment doctrine under general maritime law. *Seymore v. Lake Tahoe Cruises, Inc.,* 888 F.Supp. 1029, 1034–35 (E.D.Cal.1995); *Borden v. Amoco Coastwise Trading Co.,* 985 F.Supp. 692, 697 (S.D.Tex.1997).

> To prevail on a tort claim for a discharge in violation of public policy, an employee must show (1) a clearly defined public policy protected an activity; (2) the policy was undermined by discharging the employee; (3) the discharge was the result of engaging in the protected activity; and (4) there was no other justification for the discharge.

*Zbylut v. Harvey's Iowa Management Co., Inc.,* 361 F.3d 1094, 1095–96 (8th Cir.2004).

Some courts, however, have held that the exception to the at-will doctrine for public policy considerations established in *Smith* should be read narrowly. *See Meaige v. Hartley Marine Corp.,* 925 F.2d 700, 702 (4th Cir.1991) ("Only one exception exists to the general at-will employment rule in maritime law: a seaman may file a personal injury action without retaliation.") Moreover, other courts have limited the types of claims that constitute wrongful discharge in violation of public policy actions to maritime law disputes. *See Kelley v. Schlumberger Technology Corp.,* No. 85–4794, 1987 WL 9908, at *1 (D.Mass.1987) (Zobel, J.) (holding *Smith* does not apply where plaintiff's wrongful discharge claims are based on ordinary contract and tort law).

Where public policy implications are weak, e.g., an employee's refusal to breach a federal regulatory law, courts have held there is no maritime law cause of action for retaliatory discharge. *See Zbylut,* 361 F.3d at 1096 (holding there is no clear public policy when seaman is terminated for refusing to falsify ship's log books in violation of a federal statute). A retaliatory discharge tort may not be available even if an employee is fired for refusing to violate a federal safety statute. *See Meaige,* 925 F.2d 700, 702 (4th Cir.1991) (refusing to extend exemption to employee fired after refusing to perform assignment that allegedly violated federal safety statute); *Feemster v. BJ–Titan Services Co./Titan Services, Inc.,* 873 F.2d 91, 93 (5th Cir.1989) (holding the retaliatory discharge exception to at-will maritime contracts should not be broadened to include

an employee who was terminated after his alleged refusal to perform an assignment that would violate a federal safety statute).

Other courts have interpreted *Smith* more broadly and have recognized a wrongful discharge cause of action under maritime law where the conditions present perilous dangers for mariners and the general public. *See Seymore*, 888 F.Supp. at 1034–35 (recognizing a maritime law exception where captain was terminated after allegedly refusing to pilot vessel he reasonably believed posed risk of death or serious injury to passengers or crew, holding it is appropriate to recognize a wrongful termination cause of action given the "strong public policy at issue in the present case"); *Borden*, 985 F.Supp. at 697–98 (recognizing an admiralty law exception to the at-will doctrine where an employee allegedly refused to sail a vessel which he believed was unseaworthy, could pollute the waters, endanger the crew, and whose operation, under such conditions, would violate a federal statute, holding plaintiff alleged "*clearly important public policy concerns*") (emphasis in original).

Whereas the plaintiffs in *Feemster* and *Meaige* alleged regulatory statute violations that pose relatively weak public policy issues, maritime activity that endangers human life raises significant public policy concerns. *See Seymore*, 888 F.Supp. at 1035 (public interest in preventing captain from taking out unseaworthy vessel is "stronger" than the policy issues in *Smith*, "allowing the employer to fire a captain at will for refusing to take out an unseaworthy vessel would create an incentive for the captain to risk human life in order to retain his employment."); *Borden*, 985 F.Supp. at 697 (distinguishing regulatory concerns from those raised by safety risks to crew and public harm from risk of pollution, "The public policy implicated in the case at bar is much stronger than that in

*Feemster*.") In *Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 674 (7th Cir. 2008), the Seventh Circuit noted that the Supreme Court has not yet confirmed a "judge-made admiralty tort" for retaliatory discharge based on employees raising safety concerns. "Nevertheless, on balance a uniform, preemptive admiralty remedy would appear to make good sense." *Id.*

Although courts may be divided on the extent of the remedy available under maritime law, mariners may rely on the statutory protection against retaliatory discharge available under the Seaman's Protection Act, also known as the federal whistleblower statute, 46 U.S.C. § 2114. Section 2114(a)(1) provides:

A person may not discharge or in any manner discriminate against a seaman because—

(A) the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred; or

(B) the seaman has refused to perform duties ordered by the seaman's employer because the seaman has a reasonable apprehension or expectation that performing such duties would result in serious injury to the seaman, other seamen, or the public.

If a seaman is discharged in violation of the statute, he may bring an action in an appropriate district court seeking back pay and any other appropriate relief. *Id.* at § 2114(b).

■ Congress passed the Seaman's Protection Act, in response to the Fifth Circuit opinion in *Donovan v. Texaco, Inc.*, 720 F.2d 825, 829 (5th Cir.1983) (holding the Occupational Safety and Health Act's prohibition against retaliatory discharge

did not apply to a seaman who was demoted then terminated after contacting the Coast Guard to complain about the vessel). *Gaffney v. Riverboat Services of Indiana, Inc.,* 451 F.3d 424, 446 (7th Cir.2006). The statute's goal is to guarantee that, "when seamen provide information of dangerous situations to the Coast Guard, they will be free from the 'debilitating threat of employment reprisals for publicly asserting company violations' of maritime statutes or regulations." *Id.* at 444 (quoting *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor,* 992 F.2d 474, 478 (3d Cir.1993)).

■ Plaintiffs seeking to invoke the protection of the federal whistleblower statute must establish that their employer was aware of their intent to report them to the Coast Guard, or another appropriate federal agency, before an adverse action was taken. *Robinson,* 513 F.3d at 671. A plaintiff may not bring a claim under 46 U.S.C. § 2114(a) for retaliatory discharge if he did not tell anyone before he was fired that he was planning to complain and reported employer to the Coast Guard only after he was terminated. *Id.*

### D. Baetge–Hall's Whistleblowing Allegations Generally Establish a Prima Facie Case of Retaliatory Discharge

Baetge–Hall claims AMSEA terminated her because she declared her intent to seek legal recourse 1) to be reinstated to her position, and 2) to confirm AMSEA uniformly complied with the Sealift Command vaccination requirements for its crew members.

This case presents an issue of first impression. Baetge–Hall claims that she can establish a prima facie case of retaliatory discharge because AMSEA terminated her after she declared her intent to seek legal remedies to resolve her employment discrimination claims. Baetge–Hall relies on *Smith* to support her position that maritime law provides for a retaliatory discharge tort when a plaintiff is fired for stating their intent to seek legal recourse against an employer. Unlike the plaintiff in *Smith,* however, there is no evidence that Baetge–Hall planned, or expressed an intent to file a Jones Act personal injury action against AMSEA. Instead, she planned to pursue legal remedies to restore her employment standing.

■ Hitherto, no court sitting in admiralty has established a retaliatory discharge tort under maritime law for a person terminated after declaring their intent to seek legal recourse for an adverse employment action. There is "no general cause of action for wrongful discharge under maritime law". *Garrie v. James L. Gray, Inc.,* 912 F.2d 808, 813 (5th Cir.1990) (citing *Feemster,* 873 F.2d at 93). *Smith* created a cause of action based on an employer terminating a seaman for exercising rights already existing under maritime law, such as bringing a Jones Act claim. *Belanger v. Keydril Co.,* 596 F.Supp. 823, 826 (E.D.La.1984), *aff'd without opinion,* 772 F.2d 902 (5th Cir.1985) (distinguishing *Smith* as a case that "was specifically limited to situations in which a seaman is discharged in retaliation for seeking to enforce an already existing right under maritime law"). Courts have shied away from interpreting *Smith* broadly to support new or additional rights that are not supported under maritime law. *See id.* at 825–26 (holding that the court does not have the authority under maritime law "to create a cause of action for age discrimination," which is a legislative matter for Congress). Moreover, courts have resisted applying *Smith* to actions arising from general contract or tort disputes. *See Kelley,* 1987 WL 9908 at *1 (holding *Smith* is inapplicable where plain-

tiff was terminated subsequent to drug testing; his wrongful discharge claims are "not peculiarly maritime-based" but rather based on "ordinary contract and tort law").

■■■ Baetge–Hall cannot establish that she was planning to exercise rights that already existed under maritime law. She intended to seek legal recourse to address the perceived discriminatory treatment she received after not taking the vaccination. While her allegations may raise issues under correlative state or federal law, Baetge–Hall cannot point to any existing maritime law protection against adverse employment action in retaliation for a protest against alleged discriminatory treatment. Maritime law wrongful discharge causes of action were not established to address the type of legal recourse sought by Baetge–Hall. "Significantly, a primary duty relating to fair and nondiscriminatory employment practices does not already exist under the General Maritime Law and it is not within this Court's power to create one." *Belanger,* 596 F.Supp. at 825–26. Where, as here, there is no indication of strong public policy interests, the Court is hesitant to create a new cause of action under maritime law. Accordingly, Baetge–Hall cannot establish a prima facie case of retaliatory discharge under maritime law with respect to her seeking legal remedies for alleged discriminatory treatment.

■■■ Conversely, Baetge–Hall can establish a prima facie case for retaliatory discharge under maritime law for whistleblowing. Terminating an employee for allegedly stating her intent to notify federal authorities about dangerous or harmful activities aboard a seagoing vessel raises significant public policy concerns. Courts have recognized an alleged termination for whistleblowing raises important public policy concerns, and supports a cause of action for retaliatory discharge under maritime law. *See Seymore,* 888 F.Supp. at 1034–35; *Borden,* 985 F.Supp. at 697. The significance of public policy concerns regarding an employer deterring potential whistleblowers through termination is also evinced by the Seaman's Protection Act, 46 U.S.C. § 2114.

The alleged facts present significant public policy concerns. Baetge–Hall claims she was pressured to take vaccinations shots she reasonably believed would pose a serious risk of injury based on her preexisting medical conditions. In addition, she alleges Captain Pigott instructed her not to correct a medical log which falsely indicated that the remaining *John P. Bobo* crew members had all received the Sealift Command's requisite vaccinations. While vaccination, or a lack thereof, could potentially constitute a health hazard to the employee involved, another public policy problem is raised by extension. The *John P. Bobo* was sailing into a high risk zone. Sailing a vessel into harm's way without crew members having received the requisite vaccinations or possibly having severe adverse reactions, endangers the lives of those crew members. Military forces depend on the supplies, ammunition, and food aboard these prepositioning ships. Foreseeably, this scheme could also interfere with the timely delivery of supplies to U.S. military forces engaged in conflict. Where the alleged infraction of a federal statute creates a menace to crew members and the greater public, it constitutes a strong public policy matter. *See Borden,* 985 F.Supp. at 697.

The factual record indicates that AMSEA was aware of Baetge–Hall's allegations about the vaccination process and a scheme involving fraudulent conduct regarding Oliver's vaccination before she was terminated. The parties dispute whether AMSEA's decision to terminate Baetge–Hall was based on her threat to seek legal

recourse to adjust AMSEA's records with the Sealift Command to reflect the alleged vaccination scheme. There is a clearly defined public policy protecting whistle-blowing and Baetge–Hall alleges that she was terminated for engaging in this protected activity. Baetge–Hall has therefore established a prima facie case of retaliatory discharge.

### E. AMSEA's Legitimate Non–Retaliatory Reasons for Termination

■ AMSEA may successfully defeat the action by demonstrating that the purported reason was not a substantial motivating factor for the discharge. *See Smith,* 653 F.2d at 1064. AMSEA contends that Baetge–Hall was terminated because she refused to take the anthrax shots and that her refusal to take the shots put the crew and vessel at risk of being "off hire" or unable to fulfill its contract obligations with the Sealift Command. (Def.'s SOF ¶ 45.) The Officers' Union denied her grievance on the ground that it lacked merit because individuals present, including Sealift Command employees, stated that Baetge–Hall refused to take the shot. (Def.'s SOF., Ex. 15)

Baetge–Hall disputes that she refused to take the shots. She contends that she was willing to take the anthrax shot if she received medical clearance. Nonetheless, given the potential contractual liabilities for having a prepositioning ship unable to serve its mission, Baetge–Hall's perceived refusal to take the requisite vaccinations qualifies as a non-retaliatory reason for her discharge.

■ While AMSEA provides a non-retaliatory reason for Baetge–Hall's discharge, the evidence of disparate treatment between Oliver and Baetge–Hall provides circumstantial evidence of retaliatory animus. Evidence of disparate treatment between employees engaged in similar conduct serves as circumstantial evidence of retaliation. *Schuppman v. Port Imperial Ferry Corp.,* No. 99–3597, 2001 WL 262687, at *3 (S.D.N.Y. March 15, 2001). Sealift Command policy required all employees who refused or were medically unable to receive vaccinations to "leave the vessel at the earliest opportunity." Williamson Aff. ¶ 5. Williamson and Peter Lawrence, AMSEA's Vice–President of Operations, discussed Baetge–Hall's situation, decided to follow the policy and accordingly have her removed from the vessel, and sought a relief replacement for her position. Although Baetge–Hall was removed from the vessel, Oliver, another employee, was permitted to remain aboard the ship without having the necessary smallpox vaccination. Neither employee received both the requisite vaccinations administered by Sealift Command on October 10–11, 2003. Oliver took the anthrax shot but did not receive the smallpox shot.

AMSEA maintains that Oliver was not removed from the *John P. Bobo* because Williamson was not informed of Oliver's missing smallpox vaccination until after October 16, and it was not possible to obtain a relief for him in that short period of time. *Id.* at ¶ 10. AMSEA does not explain why Williamson was not notified about Oliver's situation or why only he was permitted the opportunity to receive a medical opinion from a source off the vessel regarding his ability to take the vaccination. Moreover, if hindrance to AMSEA's ability to fulfill its contractual obligations is sufficient reason for discharge, AMSEA fails to distinguish Baetge–Hall's situation from Oliver's. This record of disparate treatment between similarly situated colleagues presents circumstantial evidence that Baetge–Hall's termination may have been motivated by retaliatory animus.

### F. Maritime Retaliatory Discharge Action Not Precluded by Non Jones Act Claim

 AMSEA contends that Baetge–Hall's retaliatory discharge claim is precluded. AMSEA argues that Baetge–Hall never filed a personal injury action against AMSEA under the Jones Act, 46 U.S.C. § 30104, and that she does not allege that she ever filed an action or that her employment was terminated in retaliation for bringing such an action. Wrongful discharge claims under general maritime law are not limited exclusively to Jones Act claims. *See Robinson,* 513 F.3d at 671 (deckhand brought retaliatory discharge claim under admiralty law and 46 U.S.C. § 2114). Thus, Baetge–Hall's claim is not precluded because she is not bringing a Jones Act claim for personal injury.

### G. AMSEA's Preemption Argument is Barred Under the Law of the Case Doctrine

 Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), provides for federal court jurisdiction irrespective of amount or diversity over "(s)uits for violation of contract between an employer and a labor organization regarding employees in an industry affecting commerce." *Sullivan v. Raytheon Co.,* 262 F.3d 41, 49 n. 6 (1st Cir.2001)(quoting 29 U.S.C. § 185(a)), *cert. denied,* 534 U.S. 1118, 122 S.Ct. 931, 151 L.Ed.2d 893 (2002). For litigants bringing claims based on a state law claim, Section 301 of the LMRA "completely preempts" a state law claim, " 'if the resolution of (the) state-law claim depends upon the meaning of a collective bargaining agreement.' " *Id.* at 49 (quoting *Magerer v. John Sexton & Co.,* 912 F.2d 525, 528 (1st Cir.1990)) (alteration in original) (quoting *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)).

 At the motion to dismiss stage, Judge Lindsay ruled Baetge–Hall's claim is not preempted by Section 301 of the LMRA. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Naser Jewelers, Inc. v. City of Concord, N.H.,* 538 F.3d 17, 20 (1st Cir.2008) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). There are limited exceptions exist to the law of the case doctrine, e.g., the initial ruling was designed to be preliminary, there is newly discovered evidence, or there has been a "material change in controlling law." *Id.* AMSEA however does not meet any of these exceptions. Accordingly, AMSEA's preemption claim is barred under the law of the case doctrine.

### H. Baetge–Hall's Membership in Maritime Union Does Not Preempt Wrongful Discharge Action Under Maritime Law

 AMSEA contends that Baetge–Hall is preempted from bringing a wrongful discharge action under federal maritime law because the remedy is provided exclusively for at-will employees and the plaintiff's employment was governed by a collective bargaining agreement with her labor union, the American Maritime Officers' Union. "In Massachusetts, the 'cause of action for wrongful discharge in violation of public policy is a judicially created exception to the 'employment at will' doctrine." *Acciavatti v. Professional Services Group, Inc.,* 982 F.Supp. 69, 74 (D.Mass.1997) (Tauro, J.) (quoting *Cullen v. E.H. Friedrich Co., Inc.,* 910 F.Supp. 815, 821 (D.Mass.1995) (Ponsor, J.)). As employees who are employed under a col-

lective bargaining agreement have greater protections than at-will employees, they may not pursue wrongful discharge remedies available under state law for at-will employees. *Cullen*, 910 F.Supp. at 821 ("Allowing employees governed by a [collective bargaining agreement] to assert an independent, common law claim of wrongful discharge would ... deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.'") (citations omitted); *Connolly v. Boston Edison Co.*, No. 00–11849, 2001 WL 575868 at *5 (D.Mass.2001) (Dein, M.J.) (holding terminated employee may not bring Massachusetts cause of action for wrongful discharge in violation of public policy claim which "applies only to 'at-will' employees, not to an employee who is covered by a [collective bargaining agreement].")

■ At the circuit level, however, the law is to the contrary. The Sixth Circuit majority holding in *Merchant v. American Steamship Co.*, 860 F.2d 204, 211 (6th Cir. 1988) rejects the notion that the existence of a collective bargaining agreement should determine whether a seaman is permitted to pursue legal remedies for wrongful discharge and holds that it would be create "an irrational distinction between union and nonunion seamen." The majority ruled that there was "no justification for this disparate treatment of labor union members," especially where ramifications would limit the type of damages available to a union versus nonunion seaman bringing a retaliatory discharge claim. *Id.* at 210.

The *Merchant* court draws from the Supreme Court reasoning in *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). In *Lingle*, the Supreme Court held that the petitioner's state claim for retaliatory discharge is not preempted by Section 301 of the LMRA even though petitioner was a member of a union with a collective bargaining agreement. 486 U.S. at 408–09, 108 S.Ct. 1877. In retaliatory discharge actions, the elements of the claim focus on the conduct of the employee and the motivation of the employer, thus, a court is not required to interpret collective bargaining agreement terms. *Id.* The claim is not preempted even if the retaliatory discharge claim involves factual inquiry relevant to a contractual determination of termination for cause. *Id.* The *Merchant* majority reasoned there was no reason to distinguish maritime employees from the land-based employees in *Lingle*. 860 F.2d at 211. The court held that "a seaman's tort action for retaliatory discharge exists independent of any collective bargaining agreement" and is therefore neither preempted by the LMRA nor requires the exhaustion of contractual remedies. *Id.*

In *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 636 (3rd Cir.1990), the Third Circuit noted that although arguments that unions provide substantial protection of unionized seaman are persuasive, the Supreme Court has not demonstrated a willingness to depart from "long-established solicitude for seamen." *Id.* at 637. "Until it does so, we see no basis to assume that the emergence of powerful seamen's unions, a development concerning which the Court has full knowledge ... justifies our ignoring the Court's clear and frequent pronouncements that seamen remain wards of the admiralty." *Id.*

While the First Circuit has not yet addressed this issue, the logic of the sister circuits is as persuasive as it is prudent. The Supreme Court has a long history of being inclined to grant rather than restrict access to maritime claims and protect sailors wherever possible. *See Barnes*, 900 F.2d at 637. Given that history of concern for mariners, the *Merchant* court's analo-

gizing of the Supreme Court's holding in *Lingle* protecting the ability for union employees of non-maritime employers to bring retaliatory discharges convinces this Court that the public policy interest in protecting employees from retaliatory discharge is so great that Baetge–Hall may bring an action even though her employment is otherwise governed by a collective bargaining agreement. *See Merchant,* 860 F.2d at 210–11.

### I. There Are Genuine Issues of Material Fact in Dispute

Summary judgment is inappropriate where there are genuine issues of material fact in dispute and in the instant case there are several issues of material fact in dispute.

First, and most important, the parties dispute whether Baetge–Hall refused to take the anthrax vaccination. She asserts that the vessel's contemporary records confirm that her refusal to take the shots was not willful and did not constitute a basis for termination for cause. Next, the parties dispute whether Captain Pigott knew that Baetge–Hall's alleged reasons for not taking the vaccinations were based on her medical history. After the Sealift Command raised its concerns, Baetge–Hall claims that Captain Pigott pressured her to take the shots. She claims that she told him that she was medically unable to take the vaccinations. AMSEA contends that Baetge–Hall never told Captain Pigott that there was a medical reason why she could not receive the vaccination. According to AMSEA, Captain Pigott did not know about Baetge–Hall's medical history prior to her departure.

In addition, the parties dispute what Baetge–Hall allegedly told Williamson during their October 24, 2003, telephone conversation subsequent to her departure. AMSEA claims Williamson testified that

Baetge–Hall stated that she never intended to take the shots. Baetge–Hall, however, argues that she never expressed an intent not to take the vaccinations but instead conveyed her intention to pursue legal options. A factfinder could reasonably resolve the disputed facts in the favor of the non-movant, thus, summary judgment is inappropriate. *American Steel Erectors, Inc.,* 536 F.3d at 75.

### IV. CONCLUSION

A reasonable factfinder could find that AMSEA's stated reasons for terminating Baetge–Hall were a pretext to cover its retaliation against her for raising irregularities in the vaccination process. Therefore, AMSEA's motion for summary judgment is DENIED. Since the case is now ready for trial, it shall be randomly redrawn and promptly put to trial.

SO ORDERED.